STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MICHAEL O'CONNOR, DEFENDANT-APPELLANT.

Argued May 4, 1964—Decided June 22, 1964.

*Mr. Albert J. Shea* argued the cause for defendant-appellant.

*Mr. Gregory J. Castano,* Assistant Prosecutor of Hudson County, argued the cause for plaintiff-respondent (*Mr. James A. Tumulty, Jr.,* Prosecutor of Hudson County, attorney).

The opinion of the court was delivered by

FRANCIS, J. Defendant Michael O'Connor, also known as "Moon Mullins," was found guilty of murder in the first degree. The jury recommended life imprisonment and that sentence was imposed. His direct appeal to this Court followed. *R. R.* 1:2–1(c).

On the appeal defense counsel in his brief alleges a number of trial errors in the admission of evidence, in the failure to grant a mistrial and in the court's charge to the jury. In addition, the defendant himself has filed a memorandum raising some additional issues. Much of his argument relates to the sufficiency of the State's case against him. In reaching our decision, we have given consideration to the matters presented by the memorandum as well as by the brief.

On August 27, 1962 at about 10:30 P. M., Michael Walsh was shot to death in Rocky's Tavern at 373 Palisades Avenue, Jersey City, New Jersey.

The evidence adduced showed that O'Connor and Charles Ross entered the tavern between 6:30 and 7:00 P. M. They sat near the farthest end of the bar from the front door. Sometime thereafter, Michael Walsh and Charles Melley came in. The time was variously estimated by the witnesses as between 6:30 and 8:00 P. M. They took seats near the center of the bar. According to Melley they had spent some time drinking at another bar before they reached Rocky's.

After the four men had been at the bar for a while, according to O'Connor, an unidentified patron came over and told him Walsh had called him "an over-rated bum." O'Connor made no answer nor did he say anything to Walsh. A short time later Walsh walked down to O'Connor and had a brief

conversation with him. Melley did not hear it but said that before leaving to talk to O'Connor, Walsh said, "There's a friend of mine." O'Connor described the incident in this fashion:

"* * * He slapped me on the side heavy-handedly and said 'How are you, Moon?' and I said 'O.K.' and greeted him and said hello to him and he said, 'How are you doing?' and I said, 'Not so hot' and he said, 'Are you working?' I said, 'No, I'm not doing nothing!' He said, 'Ain't the mob taking care of you?' and I turned around and I said, 'The hell with the mob.' I said, 'They don't want friends. They want stooges.' And he said to me, 'Are you implying that I'm a stooge?' I said, 'No sir, there's nothing personal in that remark.' He said, 'You and I aren't going to fight, are we?' and I said, 'No sir, there's no reason for it,' so then he looked at me and he went back to his place where he was sitting * * *."

According to Melley, Walsh conversed with O'Connor on two or perhaps three occasions. No one heard any argument or loud talk between them. In his testimony, however, O'Connor indicated there were only two conversations, the one just quoted, and the other immediately preceding the shooting.

Melley was not aware Walsh had left his place at the bar again until his attention was called to the presence of Walsh and O'Connor in the pool table area. The pool table was about halfway between the end of the bar and the men's room at the extreme northerly corner of the tavern. Walsh was standing with his back to the pool table and facing the front of the tavern. O'Connor was about two feet from Walsh and facing him directly. The loud voice which attracted Melley was O'Connor's, who said, "Do you want me to shoot you?" Melley could not see any weapon but O'Connor's statement was followed almost immediately by a shot. After the shot was fired, Walsh staggered forward toward Melley, "holding himself." As he did so, he said, "I just got it." O'Connor stood aside and Melley, whose attention was directed toward Walsh, did not notice where he went. Walsh fell to the floor as Melley grabbed for him and yelled, "Somebody do something," but the few patrons there were all hurrying out of the place. One

John Fisher, who was sitting on the front steps of the tavern, heard the shot and came into the barroom. He telephoned the police. They appeared in a very short time. Walsh was dead and his body was taken to the morgue.

Lawrence Harjes, a witness called by the State, was sitting at the extreme front end of the bar near the entrance door. He heard what sounded like a firecracker and saw people start to run out of the place. Then he observed O'Connor standing in the rear of the room holding a gun which he was moving from left to right. Seeing this, Harjes fled also.

O'Connor's version of the shooting conflicted sharply with Melley's testimony. He said that a few minutes after their first conversation he saw Walsh walking toward him again. He thought Walsh was heading for the men's room but he touched O'Connor and said he wanted to speak to him. O'Connor left the bar and followed Walsh who, when he reached the pool table with O'Connor about two feet from him, turned around and "the next thing [O'Connor] knew there was a gun in [his] stomach." Walsh then said, "I can shoot your guts out and get away with it." At this, according to O'Connor, he said, "Why do you want to shoot me?" and simultaneously punched Walsh in the mouth with his left hand. Walsh fell back, off balance, and O'Connor grabbed the hand holding the gun. There was a struggle and the gun went off accidentally. O'Connor then "ripped" the gun out of Walsh's hand and backed away from him. As he backed toward the front door with the gun in his hand Walsh moved in the same direction "half backing and half on the side like" until he reached Melley to whom he said something. When O'Connor went out the front door Walsh was still standing.

On leaving the tavern O'Connor headed toward his car which was parked a block away. On the way he saw a refuse can into which he threw the gun and covered it with some of the garbage. He went on to his car and drove to a tavern in Hoboken where he remained until closing time at 2:00 A. M. He slept in the car until morning, bought a paper and read that he was wanted in connection with the homicide. His

own description of what he then did is graphic: "And a man in my position, he runs and I ran." He sold his car, apparently somewhere in New Jersey, for $85 and went to an undisclosed place in the State of New York. After two weeks he went to Florida but returned to New York about two weeks later. He remained in New York until he was apprehended by the Federal Bureau of Investigation on December 28, 1962. He gave the arresting officer a false name but later admitted his identity when confronted with a photograph. Thereafter he was returned to New Jersey and indicted on two counts, one for murder and the other for manslaughter.

We have not attempted to set out all of the testimony in the case in precise detail. But the basic factual framework has been noted. It makes plain that the question of guilt or innocence depended largely upon O'Connor's credibility.

O'Connor derived some measure of support from his companion, Ross. At one point in his testimony Ross said he saw O'Connor and Walsh facing each other at about arm's length near the pool table. They were not talking loudly enough for him to hear so he paid no further attention to them until he was attracted by a commotion. In another portion of his testimony he asserted he never saw Walsh and O'Connor in the pool room until he heard a commotion. More particularly, he said he heard "a scuffling like." It looked to him "like somebody threw a punch" and then they "were leaning into each other or pushing at each other." Then "it looked like somebody had thrown a punch and I don't know if it was thrown already or if it was the act of throwing it, but it looked like they were both pushing at one another." Finally he conceded he saw no punch and the court instructed the jury to disregard his surmise. He described the pushing by saying that O'Connor's hands were on Walsh's chest and Walsh's hands were on O'Connor's hips. He thought there was going to be a brawl and so he left the tavern. He did not hear anyone say, "Do you want me to shoot you," nor did he see the shooting or a gun.

Ross' testimony is not reconcilable with that of Melley or O'Connor. If what either of the latter two said happened was correct, a jury could well find that it would have been impossible for Ross to have gotten out of the tavern before the shooting occurred. The jury could have inferred that he saw the shooting but because he had been a long-time friend of O'Connor, also known to him as Moon Mullins, he did not wish to reveal his knowledge. Moreover, in assailing his credibility, the State proved that a number of years earlier Ross had been convicted of selling narcotics and sentenced to a year in Alcatraz, California.

In attacking O'Connor's account of the shooting and the struggle allegedly preceding it, the State called Dr. Jonathan C. Gibbs, Jr., the Assistant County Medical Examiner who performed an autopsy on Walsh. He found a hole in the body indicating the entrance of a bullet .15 centimeters below the right nipple and 6 centimeters to the right of the midline. *There were no powder marks or burns around the wound.* The autopsy showed the bullet had passed through the top part of the gall bladder, through the small intestine and the head of the pancreas, and then through the abdominal aorta, coming to rest in the body of the first lumbar vertebra.

Dr. Gibbs was followed by John P. Brady, the chief chemist and toxicologist for the New Jersey State Police. On August 30, 1962 he was given the decedent's blood-stained clothing for study and chemical analysis. He found a hole in the green outer shirt Walsh wore; the hole appeared in the under-shirt in relatively the same position. *There were no powder burns or powder stains on the green shirt.* The absence of such burns or stains meant that the muzzle of the gun was at least 14 inches away from the cloth when it was fired. It might have been farther away but, based on Brady's experience, it would not have been any closer than 14 inches. If the muzzle had been closer, the shirt would have shown anything from mottling powder, burned and unburned, to a charred burn with a wide periphery on the cloth at the point where the bullet entered. Obviously the testimony of Dr.

Gibbs and Mr. Brady reflected adversely on O'Connor's account of a close struggle with Walsh over the gun.

In a further attempt to impair O'Connor's veracity, the State drew admissions from him on cross-examination as to his substantial criminal record. In the past he had been convicted of armed robbery, escape from prison and carrying concealed weapons, among other crimes.

At the conclusion of the proof the trial court delivered a comprehensive charge to the jury on the law and the facts. He covered first and second degree murder and manslaughter as charged in the two counts of the indictment. He discussed the rules relating to the defense of self-defense which had been raised by defendant. And he advised them also of their obligation to acquit the defendant of all charges if Walsh was shot in the scuffle as described by O'Connor. In addition, he presented fully and fairly the duty imposed on the prosecution to prove guilt of the defendant of first or second degree murder or manslaughter beyond a reasonable doubt. We see no legal error in any of the definitions or instructions given.

As we have indicated, resolution of the issue of guilt or innocence on all the proof in the case depended in large measure on the conclusion reached as to O'Connor's credibility. We have studied the entire record and are satisfied the evidence and the inferences therefrom were adequate to justify the jury in disbelieving him and concluding that the State had established his guilt of first degree murder beyond a reasonable doubt. We can find no warrant for a determination by an appellate tribunal that the verdict was contrary to the weight of the evidence.

## I.

Defendant argues the trial court should not have submitted the issue of first or second degree murder to the jury. There is no merit in the contention. The proof produced by the State as to the circumstances of the killing with a lethal weapon, if believed by the jury, was sufficient to call

for a determination as to whether guilt had been proved of either degree of murder. See *State v. King,* 37 *N. J.* 285 (1962); *State v. DiPaolo,* 34 *N. J.* 279, 295 (1961); *State v. Ernst,* 32 *N. J.* 567, 579–580 (1960); *State v. Beard,* 16 *N. J.* 50, 61 (1954). Trial counsel for the defense quite properly made no objection to the portion of the charge dealing with this subject.

By way of refinement of this ground, defendant claims that manslaughter was the only issue that the jury should have been permitted to decide. What we have said already with respect to the propriety of the charge on first and second degree murder indicates the lack of merit in this point.

## II.

Defendant contends trial counsel's motion for a mistrial presented at the end of the case should have been granted. The motion was made on the ground that the court was severe in questioning the defendant, and that his facial expressions at various times showed disgust, amusement, disbelief of defendant, annoyance and temper. In denying a mistrial the court said he was not aware of any such facial expressions or the use of severity in questioning the defendant. He added that he was not conscious of any such appearances, and that he had never been accused of such conduct before. Counsel replied he thought the court was unconscious of the attitudes. Further he disavowed making any accusation of unfairness. "The Court has, I agree, bent over backward to be fair, but the Court is unaware of the fact that the Court's face gives vent to his feelings."

■■ The grant of a mistrial rests in the sound discretion of the court. On the whole record of the case, we can find no basis for a conclusion that denial of the motion represented arbitrary action. Moreover, in charging the jury he cautioned them with respect to his actions or conduct during the trial. He said:

I charge you that the fact that the Court saw fit in some instances to direct questions to certain of the witnesses in the case must not influence you in any way in your deliberations. The fact that the Court saw fit to direct such questions does not indicate any opinion of the Court one way or the other as to the testimony given by such witnesses. The credit and belief to be given to the respective witnesses, both for the State and for the defense, must be determined by you and you alone. * * * While the Court is not aware of any outward reactions on its part to any testimony given by the witnesses, I do, however, instruct you that if such reactions did occur, that you disregard the same and not draw any inferences therefrom, because as I stated before, the credit and belief to be given to the respective witnesses, both for the State and for the defense, should be determined by you and by you alone. * * *"

## III.

It is further argued that the trial court committed error in not including in his charge an instruction on the legal significance of the evidence of intoxication as a factor in mitigating the criminal offense, if any, to second degree murder or manslaughter. Not only was there no request to charge on the subject, but at no time did defendant throughout the entire course of his testimony suggest he was intoxicated at the time of the shooting.

## IV.

The State introduced six photographs and two X-rays of the deceased's body taken in the tavern or the morgue. Defense offered no objection. Now their admission is claimed to be plain error because they were gruesome and inflammatory in nature. The photographs of the body which showed the bullet hole were relevant, if for no other purpose, to corroborate Dr. Gibbs' and Mr. Brady's testimony about absence of powder burns on the flesh and on Walsh's shirt and undershirt. Moreover, it is an exaggeration to describe them as gruesome. *State v. Bucanis*, 26 *N. J.* 45 (1958), and *State v. Walker*, 33 *N. J.* 580 (1960), are cited to support defendant's position. The pictures in the first case, as described in the opinion, were revolting and horrifying. In the second

they were likewise referred to as gruesome, although they were not as sickening as those in *Bucanis*. Those before us now do not fit in the same category. We are satisfied from examination of them that even if they had been received in evidence over objection, reversible error would not exist.

## V.

■ Defendant's memorandum claims Juror number 9 should not have been allowed to sit at the trial.

On the fifth day of the trial the judge received information indicating that Juror number 9 had been the subject of a disorderly person complaint in the Municipal Court of Jersey City. Specifically, it was charged that he "interfered with officers in Nedicks and used foul and indecent language." (Disposition of the complaint does not appear in the record.) The matter was called to the attention of defense counsel and the assistant prosecutor by the court who then asked if they would agree to the dismissal of the juror. There were 14 jurors in the box at the time and the trial could have continued without him. The assistant prosecutor consented. Defense counsel objected, however, saying he "saw nothing in this charge which would properly disqualify this juror. He has not been convicted of a crime. He was not interrogated along these lines before he was sworn and there is no reason to believe, from the substance of this charge, that he is unqualified to render a fair verdict." In view of the objection, the court allowed the juror to continue to serve, and in the drawing at the end of the case he was selected as one of the 12 jurors to deliberate on the verdict.

Obviously the juror was not disqualified as a matter of law. Defense counsel was within his rights in retaining him for the remainder of the trial. Undoubtedly he felt it was advantageous to him to refuse consent to the dismissal, or that it would be unfair to the juror to excuse him summarily on the facts made known by the court. In any event, we do not see that the situation in any way supports a conclusion

that the rights of the defendant were prejudicially affected by the action taken.

## VI.

A number of other criticisms of the trial appear in defendant's memorandum. We have examined them in light of the entire record and find no prejudicial error justifying a reversal.

## VII.

For the reasons stated, the judgment of conviction is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.