STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ALONZO WALKER, SR., DEFENDANT-APPELLANT.

Argued November 21, 1960—Decided December 20, 1960.

*Mr. Edward S. Miller* argued the cause for the defendant-appellant (*Messrs. Gant & Miller,* attorneys).

*Mr. N. Douglas Russell,* Assistant County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Joseph H. Tuso,* Prosecutor, attorney).

The opinion of the court was delivered by

PROCTOR, J.  The defendant Alonzo Walker appeals from a judgment of conviction of murder in the first degree with a recommendation of life imprisonment.

The State's case consisted primarily of two statements signed by the defendant and the testimony of Mary Brooks, an eyewitness to the homicide.  According to defendant's statements, the following occurred:  The deceased, Mary Johnson, and the defendant lived together in Philadelphia. On Friday, September 7, 1956, they had a fight; and the following day, Mary Johnson went to the home of a friend, Mary Brooks, at 30 Eagle Street, Bridgeton, New Jersey. On Sunday, September 9, 1956, the defendant went to Bridgeton with his son, Alonzo Walker, Jr., for the purpose of persuading Mary Johnson to return to Philadelphia. When he arrived at the Brooks' house, he found that, in addition to Mary Johnson, Lonnie and Mary Williams and their daughter, Rosella, were also there.  Defendant repeatedly beseeched Mary Johnson to return to Philadelphia, but she refused.  At one point he left the house and bought a skirt and blouse for her.  When he returned, he brought with him a loaded revolver which he had in his car.  He said that he took the revolver with him because Mary John-

son had asked him to get rid of it and he wanted to show his good intentions by offering it to her so that she could dispose of it. However, he wanted her to promise to return with him to Philadelphia before he would give up the gun. Immediately prior to the shooting, they were conversing in the kitchen of the house. The defendant stated that Mary Johnson was seated at the kitchen table and he was seated opposite her. While they were talking, he took out the revolver. When she again refused to return to Philadelphia, he "reared back in the chair and said 'you gotta go' and the gun went off." He ran out of the house and dropped the gun in one of the yards in the neighborhood.

Mary Brooks testified that at the time of the shooting she and her grandchildren were in the kitchen; that the defendant was standing on the opposite side of the table where Mary Johnson was seated; and that she, Mary Brooks, was standing next to the defendant. She saw his arm rise to a horizontal position and, thinking he held a knife, exclaimed, "Oh, don't cut this woman in my home." She then heard a shot and pushed the defendant. He pushed her in return and ran out of the house.

The defendant was apprehended later that night by the Bridgeton police on a road at the outskirts of the city. The police officers testified that the defendant admitted the shooting immediately after his arrest; that he accompanied them that night in an unsuccessful search for the weapon; and that at police headquarters he signed a statement relating the circumstances of the homicide. The officers further testified that the gun was found the next day and that the defendant then signed another statement admitting that it was the gun he used to shoot Mary Johnson. Medical and ballistics experts testified that Mary Johnson died from the effects of a bullet emitted from defendant's gun.

The defendant did not take the stand. His case consisted primarily of the testimony of two private investigators who said they each had a conversation with Mary Brooks some time subsequent to the homicide and she told

them that when she saw the defendant raise his arm, she pushed him and then the gun was fired. One of the statements, signed by her, was admitted in evidence. Mary Brooks denied on the stand that she ever said she pushed the defendant before the gun was fired.

Defendant urges a number of reasons for reversal of the judgment below. We are reversing on the ground that the trial court erroneously instructed the jury on the law relative to reasonable doubt. It is therefore unnecessary for us to discuss all of the defendant's arguments. We shall, however, discuss those points which will probably arise on the retrial and others concerning procedures engaged in at the trial which we regard as improper.

The defendant originally pleaded not guilty, but later changed his plea to *non vult*. After a pre-sentence investigation, the Cumberland County Court sentenced defendant to a term of 25 to 30 years imprisonment. Thereafter, he applied for a writ of *habeas corpus* on the ground that he did not understand the nature of his plea. The County Court denied defendant's application. On appeal, the Appellate Division, treating the application as one to withdraw a plea under *R. R.* 3:7–10(*a*) and finding there was grave doubt as to defendant's having clearly understood the meaning of his plea, reversed so that he could enter a plea of not guilty and stand trial. The defendant was then tried before a jury and, as mentioned above, was found guilty of first degree murder with a recommendation of life imprisonment.

Defendant urges reversal of the judgment below on the ground that the prosecution on the first degree murder charge placed him twice in jeopardy for the same offense. He relies on *State v. Williams,* 30 *N. J.* 105 (1959). In that case we held that where a defendant is tried before a jury on a short-form murder indictment and found guilty of second degree murder and thereafter obtains a reversal, he cannot be retried for first degree murder. The rationale is that by returning a verdict of second degree murder the

jury, by necessary implication, acquits the defendant of first degree murder. His appeal from the conviction of second degree murder cannot constitutionally be interpreted as a waiver of jeopardy as to the first degree acquittal. *State v. Williams, supra*, 30 *N. J.*, at *pp*. 122 to 124. By analogy, the defendant in the present case argues that acceptance of his *non vult* plea amounted to a conviction of second degree murder and an implied acquittal of first degree murder.

██ *N. J. S.* 2*A*:113–3, which applies to acceptance of *non vult* pleas to murder indictments, provides:

"In no case shall the plea of guilty be received upon any indictment for murder, and if, upon arraignment, such plea is offered, it shall be disregarded, and the plea of not guilty entered, and a jury, duly impanelled, shall try the case.

Nothing herein contained shall prevent the accused from pleading *non vult* or *nolo contendere* to the indictment; the sentence to be imposed, if such plea be accepted, shall be either imprisonment for life or the same as that imposed upon a conviction of murder in the second degree."

A defendant does not plead *non vult* to any particular degree of murder. He pleads to the general indictment. Since under the statute the court has the discretion to impose a life sentence *or* the sentence provided for second degree murder, acceptance of a plea without more cannot constitute conviction of second degree murder. Defendant's argument is therefore without merit.

██ Although the defendant has not argued it, we shall consider whether imposition of a sentence normally imposed for second degree murder constitutes an acquittal of first degree murder. The holding in *Williams* was based largely on the nature of a short-form murder indictment. A defendant indicted for murder in the short form may be convicted of (1) first degree murder, (2) first degree murder with recommendation of life imprisonment, (3) second degree murder, or (4) manslaughter. *N. J. S.* 2*A*:113–2 provides that a "jury finding a person guilty of murder shall designate by their verdict whether it be murder in the first

degree or in the second degree." In other words, the jury is statutorily directed to consider and specify the precise degree of murder of which a defendant is guilty. In the absence of evidence to the contrary, a jury is presumed to understand and follow the instructions of the court. Accordingly, we noted in *Williams* that when a jury has heard all the evidence in a case and returns a verdict of second degree murder, it must have concluded that a necessary element of first degree murder was not proved by the State. We therefore held that a jury verdict of second degree murder is an implied acquittal of first degree murder. Is this reasoning applicable to the action of a trial judge who imposes a sentence of less than life on a plea of *non vult?*

The statute which provides for acceptance of a *non vult* plea to a murder indictment (*N. J. S.* 2A:113–3) does not require the court to conduct a hearing as to the degree of guilt before imposing sentence, *State v. Magonia,* 25 *N. J.* 95, 98 (1957), and as a matter of practice such a hearing is not held. There is, therefore, no evidence before the trial judge upon which he can base a determination of degree of guilt. When a defendant pleads *non vult,* he in effect pleads guilty, for the purpose of that proceeding, to the indictment for murder, and throws himself upon the mercy of the court. The trial judge then has the discretion to impose either life imprisonment or the punishment for second degree murder. There are many reasons why a trial judge in the exercise of his discretion may decide to impose less than life imprisonment. These include the defendant's background, whether he has cooperated with the State, whether he demonstrates remorse, and what the trial judge concludes are the chances for rehabilitation. None of these factors relates to an adjudication of the degree of murder. Under these circumstances, it cannot be said that the court determines the degree of guilt. We conclude that imposition of a sentence of less than life imprisonment upon the plea of *non vult* to a murder indictment is not an implied acquittal of first degree murder, and that therefore the defendant was

not placed twice in jeopardy by the trial on an indictment which included a charge of first degree murder.

Prior to the trial, defendant, a Negro, moved to disqualify the jury panel on the ground that there was not on the panel the number of Negroes proportionate to the number of Negroes living in Cumberland County. The motion was peremptorily denied. Defendant urges that the trial court erred in refusing either to grant the motion or to "ascertain the true facts as to the proportionate number of negro jurors with relation to the number of negroes in Cumberland County."

A challenge to the array must be in writing, *R. R.* 3:7–2(*b*), and should set forth the facts that form the basis for the challenge. *State v. Deegan,* 133 *N. J. L.* 263 (*E. & A.* 1945). Since defendant's motion was not in writing and stated no facts, these omissions would be sufficient to justify denial of the motion. *State v. Gallo,* 128 *N. J. L.* 172, 176 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 52 (*E. & A.* 1942). We shall, however, ignore the omissions and consider the merits of the challenge.

When the ground alleged in a challenge to the array is sufficient on its face, the court must permit the moving party to introduce evidence in support of his challenge. *State v. Jones,* 115 *N. J. L.* 257 (*E. & A.* 1935). But if the challenge presents no legal ground for objection to the array, the court may properly refuse to hear evidence. *Windom v. United States,* 260 *F. 2d* 384 (10 *Cir.* 1958). In order for a defendant to disqualify a jury panel because of absence of members of his race, he must show deliberate and systematic exclusion of such persons from jury service. *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1948), *certiorari* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773, rehearing denied 334 *U. S.* 862, 68 *S. Ct.* 1519, 92 *L. Ed.* 1782 (1948). In the present case, the defendant did not allege that Negroes were systematically and deliberately excluded from jury service in Cumberland County. He alleged only that there was not on the panel a number of Negroes

in proportion to the number of Negroes living in the county. A defendant does not have the right to have members of his race included on the panel or on the jury selected from the panel. *Martin v. State of Texas,* 200 *U. S.* 316, 26 *S. Ct.* 338, 50 *L. Ed.* 497 (1906); *cf. Snowden v. Hughes,* 321 *U. S.* 1, 64 *S. Ct.* 397, 88 *L. Ed.* 497 (1944). He is entitled only to a panel and a jury which are selected without discrimination from jury lists compiled without regard to the race of those qualified to serve as jurors. The fact that members of his race are not ordinarily included on the jury panels in his county is evidence of systematic and deliberate discrimination. *Eubanks v. State of Louisiana,* 356 *U. S.* 584, 78 *S. Ct.* 970, 2 *L. Ed.* 2d 991 (1958). But absence of members of defendant's race from the jury panel in a given case is insufficient by itself to show discrimination. *Martin v. State of Texas, supra.* (We note, in passing, that a Negro served on the jury which convicted the defendant.) Since the ground of defendant's challenge to the array was insufficient in law to disqualify the array, the court had no obligation to hear evidence in support of the challenge and defendant's motion was properly denied.

The same judge who accepted defendant's plea of *non vult* and denied his application for the writ of *habeas corpus* conducted the subsequent trial which resulted in the defendant's conviction. The defendant moved before the trial that the judge disqualify himself because he had participated in the previous proceedings. The motion was denied; and it is argued that such denial constituted reversible error.

Absent a showing of bias or prejudice, the participation of a judge in previous proceedings in the case before him is not a ground for disqualification. *State v. Bolitho,* 103 *N. J. L.* 246 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 446 (*E. & A.* 1927). And the fact that a judgment resulting from previous proceedings is reversed on appeal is likewise not a sufficient ground for disqualification. 30 *Am. Jur. Judges* § 82, *p.* 789 (1940); Annotation, 57 *L. Ed.* 1003 (1912) (collecting cases). In the present case,

defendant did not attempt to introduce any evidence that the trial judge had previously manifested bias or prejudice toward him. There is no showing that the trial judge had any personal or private interest apart from the fulfillment of his judicial duties. Therefore, defendant's motion was properly denied.

Defendant further urges reversal on the ground that the trial court, by conducting an examination into the voluntariness of the defendant's admissions in the presence of the jury, prevented defendant from showing that his signed statements were involuntary.

Before defendant's statements were admitted into evidence, the State examined the police officers who took them and asked questions which laid a foundation for their introduction. At the outset of this examination, defendant objected and requested the court to conduct a hearing on the issue of voluntariness outside the presence of the jury. The court declined to exclude the jury. Defense counsel then cross-examined the police officers, but failed to elicit any evidence tending to show that the statements were involuntary. At the close of the cross-examination, defendant did not take the witness stand, nor did he introduce any evidence on his behalf. The State moved to introduce the admissions into evidence; the court asked the defendant if he had any objection; and the defendant replied that if the court would not excuse the jury he had nothing further to say.

At a preliminary examination into the voluntariness of a confession, the defendant has the right to cross-examine the State's witnesses and to introduce evidence showing the confession was involuntary. *State v. Hill*, 65 *N. J. L.* 626 (*E. & A.* 1900); *State v. Craig*, 9 *N. J. Super.* 18 (*App. Div.* 1950). But the court has the discretion to conduct the preliminary hearing in the presence of the jury, *State v. Fiumara*, 110 *N. J. L.* 164 (*E. & A.* 1933); *State v. Buffa*, 51 *N. J. Super.* 218 (*App. Div.* 1958), affirmed 31 *N. J.* 378 (1960), or to exclude them from the courtroom. *State v. Gruff*, 68 *N. J. L.* 287 (*E. & A.* 1902).

In the present case, the defendant was given the opportunity to cross-examine the State's witnesses and to introduce evidence on his own behalf. His decision not to introduce evidence was apparently based on the mistaken motion that a trial judge must conduct a hearing on voluntariness out of the jury's presence. His argument that he was prevented from showing that his admissions were involuntary is therefore without merit.

The defendant also contends that the trial judge erroneously withheld the issue of voluntariness from the jury's consideration. The court told the jury that they were not to consider the issue of voluntariness but that they were to consider the degree of credibility to be accorded the defendant's admissions. Prior to *State v. Smith,* 32 *N. J.* 501 (1960), it was generally held in New Jersey that the question of voluntariness was the exclusive concern of the court. *State v. Morehous,* 97 *N. J. L.* 285 (*E. & A.* 1922); *State v. Cole, supra,* 136 *N. J. L.,* at *pp.* 611 to 612; *State v. Tune,* 17 *N. J.* 100 (1954), *certiorari* denied 349 *U. S.* 907, 75 *S. Ct.* 584, 99 *L. Ed.* 1243 (1955). The majority of this court in *Smith,* however, stated in a concurring opinion that if the court admits a confession and there is proof as to involuntariness upon which reasonable men may disagree, the issue of voluntariness is to be submitted to the jury. *Id.,* 32 *N. J.,* at *p.* 560. Since the record in the present case is barren of any evidence suggesting the defendant's admissions were involuntary, the trial court properly excluded that issue from the jury's consideration.

This court in *Smith* unanimously warned that, even if there is no evidence of involuntariness, a trial judge who has decided to admit a confession should not tell the jury he has found it to be "voluntary." *Id.,* 32 *N. J.,* at *pp.* 549, 560. The reason for this admonition is that such a statement has the tendency to intrude upon the jury's function of determining credibility. The trial judge in the present case told the jury that the defendant's admissions were "voluntary." We note, however, that the trial judge's state-

ment did not impress defense counsel as warranting an objection; and more significantly, that the trial judge repeatedly told the jury it was their exclusive province to determine the credibility and weight to be accorded the statements. Moreover, as there was no evidence of involuntariness, it is difficult to discern how the court's observation was harmful. Since we are reversing on another ground, next to be discussed, it is unnecessary for us to determine whether the trial judge's statement, in the context of his entire charge, prejudiced the defendant so as to constitute plain error.

It is next contended that the trial judge erred in refusing to charge as requested that "[a] reasonable doubt may arise from the lack or want of evidence."

In a criminal case the State has the obligation to prove every element of the offense charged beyond a reasonable doubt. A reasonable doubt may be engendered from the evidence introduced by the State or the defendant. It may also arise from the failure of the State to produce essential proof. *State v. Andrews*, 77 *N. J. L.* 108 (*Sup. Ct.* 1908); Annotation, 67 *A. L. R.* 1372 (1930) (collecting cases). This court has held that when a trial judge is requested, he must instruct the jury that a reasonable doubt may be engendered by a lack of evidence. *State v. De Paola*, 5 *N. J.* 1, 9 (1950). It is not necessary for the trial court to instruct the jury in the exact language of the request so long as he does not confine the source of reasonable doubt to the evidence presented. But nowhere in his charge did the trial judge in the present case say or imply that reasonable doubt might arise from want of proof. He did charge that the defendant was presumed to be innocent and that the State had the burden of proving every material element of the crime beyond a reasonable doubt. When, however, he defined reasonable doubt, he twice stated that such doubt must arise from "an entire comparison and consideration of *all the evidence*." (Emphasis supplied) In view of *State v. De Paola*, we do not think that a reason-

able doubt growing out of "all the evidence" satisfies a request to charge that such doubt may arise out of a lack of evidence as well. Thus the trial judge ignored the principle that a reasonable doubt may properly arise out of lack of evidence upon some issue in the case, and therefore, the refusal to charge as requested was reversible error. *State v. De Paola, supra,* 5 *N. J.,* at *p.* 9.

In light of our view that the judgment below must be reversed for the reason just discussed, it is unnecessary for us to determine whether other matters which occurred at the trial constitute, singly or in the aggregate, reversible error. Since, however, they concern procedures of which we disapprove, we shall discuss them.

On cross-examination of Mary Brooks, defense counsel, dissatisfied with her responses, asked if she was aware that she was under oath. The following colloquy between the court and counsel, in the presence of the jury, then took place:

"THE COURT: She knows she is on the stand, she is under oath and when witnesses are on the stand they are all under oath *and they all tell the truth.* Just propound the question.

MR. MILLER: How do I know she knows?

THE COURT: She is an intelligent lady and you just propound the question." (Emphasis supplied)

It is exclusively the function of the jury to determine the credibility of a witness. Accordingly, a judge should not express to the jury or in their presence his opinion as to whether a witness is to be believed. See *State v. Corbo,* 32 *N. J.* 273 (1960). In the present case, the veracity of Mary Brooks was an important issue in the trial. She stated on direct examination that when she saw defendant raise his arm, she heard a gun go off and then she pushed him. In prior statements made to the defendant's investigators, she allegedly said that she first pushed the defendant and then the gun went off. Whether the jury regarded Mary Brooks as a credible witness was important to the de-

fense's case. The court's statement that "all witnesses tell the truth" in the context of its utterance was improper because it might reasonably have been interpreted by the jury as a judicial endorsement of the witness' honesty.

■■ During the course of the trial, the court admitted in evidence over defendant's objection three photographs of decedent's brain. There was in evidence without objection a photograph of the victim's head showing the bullet had penetrated the skull over the left eyebrow. It is true that ordinarily a trial court has the discretion to admit in evidence a photograph in spite of its inflammatory nature if it is sufficiently probative of some material fact and regardless of whether it constitutes cumulative evidence. *State v. Myers*, 7 *N. J.* 465 (1951); *State v. Smith, supra*, 32 *N. J.*, at *p.* 525. But the fact that a photograph may have some probative force is not alone determinative of its admissibility. Its relevance to an issue in the case may be overbalanced by its prejudicial quality. In the present case, the photographs could only have been introduced to establish the cause of death. But there was ample testimony by the medical examiner and the pathologist as to the cause of death. Indeed, it was uncontested. There was no evidence in the case which required buttressing with these photographs of the victim's brain which we consider to be gruesome. We conclude that their relevance as evidence was substantially outweighed by their inflammatory nature and that if the state of proofs is the same at the retrial they should not be admitted in evidence. See *State v. Bucanis*, 26 *N. J.* 45, 53, 54 (1958), *certiorari* denied 357 *U. S.* 910, 78 *S. Ct.* 1157, 2 *L. Ed. 2d* 1160 (1958).

On two occasions, before and during the trial, defense counsel objected to actions of the sheriff and requested the court to ascertain the effect of such actions upon the jury. Immediately prior to the trial, defense counsel moved to disqualify the array. In support of his motion he informed the trial court that he had asked the sheriff if he could talk with the defendant and that the sheriff had replied in a

loud voice that he [the sheriff] "had great responsibility over a murderer." Defense counsel stated that this conversation took place in the corridor just outside the courtroom where a number of the jury panel were located. He continued:

"I submit to your Honor there must have been members of the jury who could have not helped but to have heard the statement made by an officer of the county in the performance of his duties. I submit to the Court that to have the sheriff of this county, within the hearing of about 80 per cent of the jury panel, to have him refer to this man as a murderer prior to a jury being impaneled is highly prejudicial and I don't think this man can be fairly and properly tried before this panel."

The court denied defense counsel's motion without investigating whether the members of the panel heard the sheriff's remark. During the trial, defense counsel moved for a mistrial. He stated to the court that he had just learned that during a recess the sheriff had, presumably unauthorized by the court, taken the jury on a bus ride throughout the county and urged the court to inquire into the circumstances of that ride. Defense counsel's request and motion were peremptorily denied.

Courts should not tolerate any conduct by court officers which might influence jurors in reaching their verdict. As this court has noted in another context:

"The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. A jury is an integral part of the court for the administration of justice and on elementary principles its verdict must be obedient to the court's charge, based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. A jury can act only as a unit and its verdict is the result of the united action of all the jurors who participated therein. Therefore, the parties to the action are entitled to have each of the jurors, who hears the case, impartial, unprejudiced and free from improper influences." *Panko v. Flintkote Co.*, 7 N. J. 55, 61 (1951).

As guardians of the administration of justice, courts must be ever alert to inquire into matters called to their atten-

tion which may affect the unbiased exercise of the jury's function. We believe that under the circumstances the trial judge should have conducted a hearing to inquire, (1) whether members of the panel heard the sheriff characterize the defendant as a "murderer," and (2) what occurred during the bus trip, if anything, which may have affected the jury's deliberations in the case.

The judgment of conviction is reversed and the cause remanded to the Cumberland County Court for a new trial.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.