134 N.J. Super. 575 (1975)
342 A.2d 533
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SARAH JEAN LAMB, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 1975.
Decided June 19, 1975.
*577 Before Judges MATTHEWS, FRITZ and BOTTER.
Mr. William L. Roughton, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney; Mr. Michael Suffness, Assistant Deputy Public Defender, of counsel and on the brief).
Mr. Lowell Espey, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. William Welaj, Deputy Attorney General, on the brief).
The opinion of the court was delivered by FRITZ, J.A.D.
Defendant appeals from her conviction by a jury of second degree murder. The difficult question in the case involves defendant's duty to retreat vel non in the circumstances here presented, a distinct variation on the theme already orchestrated by State v. Pontery, 19 N.J. 457 (1955), State v. Abbott, 36 N.J. 63 (1961), State v. Bonano, *578 59 N.J. 515 (1971), and State v. Provoid, 110 N.J. Super. 547 (App. Div. 1970).
The pertinent facts are not in serious dispute. Defendant and her husband Larry had separated. Thereafter she first occupied the apartment they had shared even though her husband was forceful to the point of criminality in demanding that she leave. When she refused, he left, returning a number of times. Subsequently he requested that she leave long enough for him to find a place. She went to her mother's home. Her husband moved all, or substantially all, his belongings elsewhere and vacated the apartment. Defendant returned to live there with a cousin.
On the night of the killing, defendant had been at a local bar with her apartment-mate cousin Charlene. Her husband came to the bar to solicit her company. In a discussion outside the bar, which was evidently not at all acrimonious, defendant refused her husband's invitation because, she told him, she "was going to go home and go to bed because I didn't feel that good."
Thereafter defendant, her cousin and a male companion named Ricky went first to a "White Castle" for a hamburger, and then the three returned to the apartment. But the cousin did not stay. She left defendant and Ricky, announcing her intention to return to the bar they had earlier visited. Ricky and defendant were playing records. Defendant exchanged her "top" for a housecoat, keeping her "slacks and things on." Charlene called twice, essentially to find out if everything was all right, and the second time to advise defendant that she was coming home.
Then Larry called. Defendant characterized his demeanor as nasty. She accused him of drinking. He did not believe the lie she told him when she responded to his inquiry by saying she was alone in the apartment.
What then transpired was graphically described by defendant in her testimony at the trial:
*579 Q Then what happened?
A A few minutes later I hear somebody coming up the steps because I was standing in the bedroom by the night stand because I went in the bedroom to answer the phone. So I heard somebody coming up the steps. So I heard the door. I didn't go open the door. I heard somebody. I hear the fist knock the door, because if you hit it with your fist it would open. You hit it very hard.
Q With a motion like this the door would open?
A It would come open. So Ricky was standing like in the living room and the bedroom.

* * * * * * * *
Q And the next thing you heard was the pound on the door and the door opened?
A Right.
Q And who came in?
A Larry come running in like that. Ricky was standing between the living room and the bedroom. And so Ricky walked up and saw  so Larry took and punched Ricky and so the next thing I know they were on the bed and tussling. I was trying to break it up.
Q Which bed?
A On the bed right here.
Q In the bed?
A I was trying to break it up. When I went over and tried to grab Larry off Ricky, Larry took and gave me a backhand like with his fist balled up and I went against the wall.
Q And where did he hit you?
A In my face. And I bounced up against the wall. And I come back and I was still trying to break them up. I don't know. Some way Ricky got away. He was going in the living room to get his coat. And so he could leave. And so by that time he walked out. I seen Ricky when he went in the living room. Larry took and grabbed me and throwed me on the bed and put his hand around my neck. He said, bitch, I'm going to kill you before I leave here. Before I leave here tonight. So by that time Ricky was coming back into the room. Him and Ricky started back. They started to tussling and got in the bed. And I ran in the kitchen and I got the knife out of the drawer.
Q Why did you get the knife?
A I was afraid. After he said he was going to kill me and everything and I wasn't really thinking, you know, about  I don't think I was thinking about what I could do to defend myself. And so then I ran back into the bedroom. So he left Ricky alone and he was coming after me. I remember getting up on the bed.
Q What do you mean by getting up on the bed?
A I jumped up on the bed. I closed my eyes and I swung the knife.
Q When you swung the knife what was your husband doing?
A He was coming at me with his fist. When he went to come at me with his fist I remember closing my eyes and coming down with the knife.
*580 Q And then what happened?
A When I opened my eyes Larry was standing there and he looked at me. He said, Jean, you stabbed me. Like that. So I said, Oh my God, no I didn't. Then I seen the blood start flowing and he fell to the floor. When he fell to the floor than I said, Oh God please don't let him be dead, like that.
In the course of his charge the judge told the jury that a defendant may not resort to the use of a deadly force when an opportunity for safe retreat is at hand. A timely objection was made on the ground that "an individual need not retreat from their own home." The judge rejected the objection for the expressed reason that
* * * the decedent had as much right in that home as the defendant. The law requires a retreat if parties are on equal footing. This was not an intruder. This was not a third party. There a person of course does not have to retreat in his own home.
Reliance for such a charge was evidently on the basis of State v. Provoid, supra, where it was held that in jointly occupied premises there is no privilege of nonretreat. 110 N.J. Super. at 544. A distinction between this case and Provoid appears: here the apartment had been the matrimonial domicile but was no longer in fact occupied by the husband. We are not persuaded that the distinction has significance. The privilege of nonretreat is frequently couched in terms of the right of one being attacked "to be at the place where he was attacked." State v. Bonano, supra, 59 N.J. at 519. Leaving aside for the moment the exceptions we have accepted, our State continues to adhere to the view that when it comes to a question whether one man shall flee or another shall live, the former shall flee rather than the latter die. Bonano, 59 N.J. at 519. The extent to which we thus esteem a human life was early recognized in Pontery, supra, where separated spouses were temporarily reunited in a jointly owned home, and the privilege of nonretreat was denied the wife by virtue of her victim husband's "equal right to be there." We are not here prepared to say that the *581 separation in the matter before us so conclusively terminated all right in the husband to be there that the wife was entitled to kill without respect to the availability of completely safe retreat, if such existed. Pontery applies, and the distinction with Provoid is more apparent than real. There was no error in the charge relating to the duty to retreat. This makes it unnecessary for us to consider further whether the claimed privilege of nonretreat continued after defendant had left the fray only to arm herself and return.
Defendant raises several additional issues. We are satisfied that her complaint against the failure of the judge to exclude her statement lacks merit. The findings by the trial judge that "defendant freely and voluntarily waived her right to counsel and knowingly and intelligently made both statements and signed the waiver of her rights and the written statement which she voluntarily gave" are abundantly supported by credible proof in the record of the voir dire hearing which was held.
Three other contentions appear which do cause us concern.
First, defendant complains with respect to the charge on provocation. We have no doubt at all that the charge in this respect should have been more carefully tailored to the facts of the relationship between defendant and the deceased as they were available to be found by the jury from the testimony. Provocation sufficient to support a verdict of voluntary manslaughter may be found in a course of ill treatment by way of the "accumulat[ion of] a detonating force." State v. Guido, 40 N.J. 191, 211 (1963). The matter is raised here as one of plain error since at trial there was no objection to the charge in this respect.
Second, during deliberation the jury returned a note whereby it obviously sought to rehear the testimony of three witnesses: the eyewitness, defendant and her cousin. The court, concerned with the probability that to grant the request would probably extend the trial two more days, refused the request, noting that the testimony, if transcribed, "would be about three hundred pages." Such a decision is a *582 matter of the exercise of sound discretion of the trial judge and we are loath to interfere. But generally where the testimony is readily available and in the absence of some unusual circumstance, such a request should be granted; the burden of time is not such an unusual circumstance. State v. Wolf, 44 N.J. 176, 185-186 (1965).
Third, the judge admitted in evidence, over defendant's timely objection, five photographs of the deceased lying where he fell after he was stabbed. Again the exercise of sound discretion is the yardstick against which this judicial decision is measured and we will not reverse absent a palpable abuse thereof. State v. Thompson, 59 N.J. 396, 420 (1971). We have seen the photographs, which are black and white pictures of a dead man lying on the floor, with a hole made by a knife in his chest. To some who, arguably at least, have become inured to such things by a professional lifetime of dealing with them, they are not "inflammatory." But the exercise of discretion in this event is a ratio between relevance and prejudice (Thompson, supra, 59 N.J. at 420-421), and we have a lot of difficulty comprehending what these pictures proved that was disputed. Their particular relevance was not argued when they were offered  only defendant's objections were heard and overruled  and their necessity has been argued to us only in such general terms as "they bolstered the credibility of various [unnamed] State's witnesses, whose testimony [unparticularized] concerning these areas was subject to attack [unspecified] during the defense presentation of its case."
We need not determine whether any of the three foregoing arguments, by itself, would support a reversal, for we are completely satisfied that the aggregate of the three resulted in untoward prejudice to defendant and a trial that was less than fair. In such circumstances we will grant a new trial. State v. Orecchio, 16 N.J. 125, 129 (1954). Such a decision also makes it unnecessary for us to consider defendant's *583 further arguments that her motion for new trial was improperly denied or that her sentence was excessive.
Reversed and remanded for a new trial.