224 N.J. Super. 231 (1988)
540 A.2d 201
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTONIO SANCHEZ,[1] DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 6, 1987.
Decided March 30, 1988.
*235 Before Judges ANTELL, DEIGHAN and R.S. COHEN.
Alfred A. Slocum, Public Defender of New Jersey, attorney for plaintiff-appellant (Pamela Lynn Brause, Designated Counsel, of Counsel, on the brief).
Herbert H. Tate, Jr., Essex County Prosecutor, for plaintiff-respondent (Marc J. Friedman, Asst. Prosecutor, of Counsel, on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
Defendant Antonio Sanchez appeals from a jury conviction for murder in violation of N.J.S.A. 2C:11-3a(1), (2) (count 1); possession of a weapon for an unlawful purpose in violation of N.J.S.A. 2C:39-4a (count 3), and two counts of unlawful possession of a weapon in violation of N.J.S.A. 2C:39-5b (counts 4 and 5). On count 1, he was sentenced to a life-term with a 30-year parole ineligibility; on count 3, to a ten-year term concurrent with the sentence on count 1, and on count 4, to a five-year term concurrent with the sentence on count 1. Count 5 was merged with count 4.
Pretrial motions by defendant for severance from trial with co-defendant Luis Columbie and to suppress the evidence were denied.
These are the facts developed at trial. On April 4, 1984, at approximately 6 a.m., defendant and a co-defendant, Luis Columbie, entered apartment 2B at 448 North 5th Street, Newark, carrying two weapons, later identified as a sawed-off shotgun and a sawed-off rifle. Defendant initially entered the bedroom of 13 year-old Juan Bultron who lived in the apartment, looking for Dino Castillo, the victim's brother. Defendant and Columbie then entered the kitchen where the victim, Enrico Castillo, was sleeping in a chair. Columbie demanded repayment of a $10 debt he claimed was owed by the victim. Castillo then gave them money and, as they were leaving, a shotgun blast was *236 heard. The blast hit Castillo in the face, neck, chest and right hand resulting in his death. The two assailants escaped in an automobile.
The incident was witnessed by Ramona Rodriquez and three children, Juan and Roxanna Rodriquez and Juan Bultron. All three children testified for the State; Ramona Rodriquez died prior to trial.
Juan Rodriquez was in bed when the incident occurred but he awoke and saw both defendants enter the apartment carrying guns. He was able to see what occurred in the kitchen by the reflection in a large mirror in his bedroom. However, he did not observe which defendant actually shot Castillo. Roxanna Rodriquez, who was in the hallway when the incident occurred, also saw both men enter the apartment with guns, heard a shot and saw defendant's gun "go up".
Juan Bultron was asleep in his bedroom when defendant, who was looking for the victim's brother, awakened him. He observed defendant and Columbie carrying guns. Bultron then saw Columbie shoot the victim, after which the defendant left the apartment. He had previously known both defendant and Columbie but was more acquainted with defendant. Bultron also saw a third party whom he identified as "Juanito" enter the apartment. On cross-examination, Bultron admitted he previously told the police that defendant killed Castillo but explained that he had been confused and it was just Columbie who shot the victim. Later he stated it could have been either one of the two men who shot the victim. Approximately six hours after the homicide, Juan Bultron readily picked out defendant from a photo array as one of the assailants.
The police questioned other occupants of the apartment building who related the events which occurred that morning and also named both defendants. They recognized defendant and Columbie because both had often played cards with the victim and his brother Dino.
*237 Warrants were issued for the arrest of both defendants and, acting on information received, the police set up a surveillance at 691 Elizabeth Avenue, Newark, the apartment of Carmen Rivera, a friend of one of the assailants. During the surveillance, one of the detectives saw defendant Sanchez come out of the apartment building, approach a parked car, open the passenger door and appeared to remove something from under his coat and place it in the car. Defendant then left the vehicle, met with two unidentified men and went back into the apartment building.
Subsequently, Columbie came out of the apartment building with a female, later identified as Carmen Rivera. He walked to the same vehicle and also appeared to remove something from under his coat and place it on the front seat. At that point, two of the detectives who were on surveillance approached Columbie who, upon seeing the officers, slammed the car door shut and attempted to flee but was apprehended. When the officers took Columbie back to the vehicle, they observed a sawed-off shotgun and sawed-off rifle on the front seat. Both of the weapons, which were loaded, were confiscated and Columbie was arrested.
In the meantime, one of the detectives pursued Carmen Rivera, who ran back into the apartment building to a fifth floor apartment, where the detective found defendant and placed him under arrest. Defendant had two suitcases, one of which was identified as his and the other as belonging to Columbie.
At trial, defendant testified that on the day in question he was moving to Union City and that Columbie picked him up at 5:30 a.m. Juan Diaz, also known as Juanito, was in the car. They then drove to Fifth Street where the victim Castillo lived. When defendant learned that they were going to Castillo's apartment, he urged them not to go there because he knew that Castillo and Columbie had a fight several days earlier.
*238 Upon arriving at Castillo's apartment, Columbie carried a plastic bag but defendant denied that he knew what was in it. An argument ensued between Columbie and Castillo; defendant and Juanito, who also came into the house, broke up a fight between Columbie and Castillo. After they stopped the fight, defendant left the kitchen and went to Bultron's room and spoke to Ms. Rodriquez. At that point, Columbie gave defendant the plastic bag, which defendant learned for the first time contained a rifle. Although he did hear a shot, defendant did not see anything and left the apartment with Columbie. As they left, defendant asked Columbie what had happened; Columbie responded that he only shot to scare Castillo but did not hit him. Defendant went back to the apartment of Josephine Ortiz, who apparently lived with Carmen Rivera, and was arrested later that evening.
Co-defendant Columbie, who also testified at trial, gave quite a different version of the events on the morning of the homicide. Columbie testifed that defendant and Juanito picked him up at his home at approximately 6 a.m. Defendant drove to the victim's apartment and, as they entered the apartment, no one was armed. Defendant left the kitchen, returned with a weapon in his hand and demanded repayment of money from Castillo. When Castillo would not pay the debt, defendant hit him with his weapon. An argument broke out and although Columbie heard the shot, he did not see who fired it. Columbie indicated that Juanito was also armed. Columbie did not go to the authorities because he was nervous; eventually he went to the apartment of his girlfriend, Josephine Ortiz, where he was subsequently arrested.
On appeal, defendant presents the following issues:
POINT I The Court Committed Reversible Error When It Refused Counsel's Request To Charge The Jury On The Lesser Included Offenses Of Reckless And Aggravated Mansalughter And Manslaughter.
POINT II The Statements Made By The Defendant While In Custody Should Not Have Been Admitted Into Evidence.

*239 POINT III Defendant Was Denied A Fair Trial Where It Appeared That The Co-Defendant Would Testify To Exculpate Himself And Incriminate Defendant.
POINT IV The Court Committed Reversible Error When It Admitted Gruesome Photographs Of The Victim Into Evidence.
POINT V The Court Committed Error When It Failed To Allow Cross Examination Of A State's Witness.

I
Under Point I, defendant contends the trial court erred in denying his request to charge on the lesser-included offenses of aggravated manslaughter and manslaughter. The trial judge refused to charge on these offenses because he stated the evidence supported either a conviction of murder or acquittal.
A trial judge is required to charge the jury as to the lesser-included offense where an appropriate request for a suitable charge is made and when there is a rational basis to find that defendant is not guilty of the more serious offense but may be guilty of the lesser-included offense. N.J.S.A. 2C:1-8e; State v. Saulnier, 63 N.J. 199, 206-207 (1973); accord, State v. Choice, 98 N.J. 295, 298-299 (1985). Although a defendant charged with murder is entitled to an instruction on manslaughter whether or not the manslaughter is consistent with his theory of defense, State v. Powell, 84 N.J. 305, 317 (1980), if the proofs support only a conviction of murder or acquittal, any lesser degree of homicide should not be charged as a possible verdict. State v. Selby, 183 N.J. Super. 273, 280 (App.Div. 1981).
The trial judge must examine the record to determine whether the rational basis test has been satisfied, State v. Crisantos, 102 N.J. 265, 278 (1986), and whether the jury could reasonably return a verdict of guilty on the lesser-included offense. State v. Hollander, 201 N.J. Super. 453, 473 (App.Div. 1985) certif. den. 101 N.J. 335 (1985); State v. Clarke, 198 N.J. Super. 219, 224 (App.Div. 1985). It is necessary then to examine the elements of murder and manslaughter in light of the facts and circumstances in this matter.
*240 A criminal homicide constitutes murder when it is committed purposely, N.J.S.A. 2C:11-3(a)(1) or knowingly, 2C:11-3(a)(2).
Murder can result from "purposeful" conduct which causes death if "it is [the actor's] conscious object to engage in conduct of that nature or to cause such a result ... [or] with respect to intended circumstances, if he is aware of the existence of such circumstances or believes or hopes they exist." N.J.S.A. 2C:2-2b(1); 2C:11-3a(1). Murder may also be based on "knowing" conduct that can result in death, if "[the actor] is aware that it is practically certain that his conduct will cause [the forbidden] result." N.J.S.A. 2C:2-2b(2); 2C:11-3a(2). Culpability, whether purposely or knowingly is determined under an objective standard.[2] See State v. Breakiron, 108 N.J. 591, 605 (1987); State v. Harmon, 104 N.J. 189, 203 (1986).
"Manslaughter" is defined in N.J.S.A. 2C:11-4a and b:
a. Criminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life.
b. Criminal homicide constitutes manslaughter when:
(1) It is committed recklessly; or
(2) A homicide which would otherwise be murder under section 2C:11-3 is committed in the heat of passion resulting from a reasonable provocation.
The elements of aggravated and reckless manslaughter are identical except for the difference in the degree of risk of death. See State v. Curtis, 195 N.J. Super. 354, 364 (App.Div.), certif. den. 99 N.J. 212 (1984). The degree of risk in reckless manslaughter is a mere possiblity of death. In aggravated manslaughter, however, the additional element that death be caused "under circumstances manifesting extreme indifference to human life" elevates the risk level from a mere possibility to a probability. The relevant circumstances are objective and do not depend on defendant's state of mind. Ibid.
*241 Defendant cites two aspects of the evidence which he contends provide the plausibility of a lesser degree of criminal homicide. First, the altercation between the victim and defendants just prior to the shooting and, second, from his testimony the jury may have found that his presence and conduct at the time of the incident were reckless enough to support a conviction for manslaughter.
As to the first contention, defendant states that he had to "get in between the victim and Mr. Columbie to prevent anything from occurring." He contends this testimony provides a rational basis to support a conviction of manslaughter because it is "plausible" that the altercation satisfies the "reasonable provocation" element of passion/provocation manslaughter.
From our analysis of the record, defendant completely mischaracterizes the actual testimony and the applicable legal standards. Defendant's testimony regarding the altercation in no way indicated that he was provoked by the victim which resulted in the altercation or that he was an actual participant in the argument. Under these facts, the alleged altercation could not have provided a reasonable provocation to reduce the homicide to passion/provocation manslaughter.
Here there was no "combatant exchange", State v. Bowens, 108 N.J. 622, 632 (1987), but rather, as defendant testified, he had to get in between the victim and Columbie to prevent anything from occurring. Words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter. State v. Crisantos, 102 N.J. 265, 274 (1986). The offense is not manslaughter but murder where the assailant alone was armed and took unfair advantage of the deceased. Id. at 274-275, citing 1 Warren on Homicide (perm. ed. 1938, § 110 at 525-26). If a person kills another with a deadly weapon which he used from the beginning or concealed on his person from the beginning, the homicide *242 constitutes murder. Id. at 275, citing 2 Wharton's Criminal Law (14th ed. 1979) § 110 at 254.
The issue of passion/provocation manslaughter is ordinarily a question for the jury, "unless the evidence is so weak as to preclude jury consideration." Crisantos at 275, citing State v. Sinclair, 49 N.J. 525, 540 (1967). Here, there is a total absence of any evidence in the record of "passion" or extreme emotional disturbance. See Crisantos, 102 N.J. at 269, 280. Absent facts to support a charge for passion/provocation manslaughter, the trial court may not charge the jury because there is no rational basis to convict defendant of the included offense of passion/provocation manslaughter. N.J.S.A. 2C:1-8(e); Crisantos at 275.
Defendant's second contention on this issue concerning the failure to give a charge on manslaughter is based on his testimony that he had no intention to kill the victim nor was he aware that co-defendant Columbie possessed a weapon or had intended to kill the victim. He argues that his presence and conduct at the time of the incident was sufficient to reduce the homicide to a conviction for aggravated or reckless manslaughter, which is a lesser-included offense of aggravated manslaughter. Id.; N.J.S.A. 2C:1-8d, e; State v. Reed, 211 N.J. Super. 177, 183-84 (App.Div. 1986).
There is a fine line between a purposeful and knowing culpability, which may amount to murder, and reckless culpability which results in aggravated manslaughter.[3] The Legislature downgraded "extreme indifference" reckless homicide *243 from murder to aggravated manslaughter. State v. Grunow, 102 N.J. 133, 143 (1986).
From an analysis of the facts and circumstances, we are satisfied there was no basis to support a charge for either aggravated or reckless manslaughter. The testimony of both defendant and co-defendant Columbie was substantially similar; they both testified they went to the victim's apartment in the early morning hours but each claim the other was in possession of the sawed-off shotgun or rifle and, although neither saw the other actually do the shooting, they each heard the shot and infer that the other was the shooter. It was a "hit-and-run" situation where defendants came into the apartment looking for one person, shot another and immediately left the scene. The victim was unarmed, and was brutally shot apparently by a blast from a shotgun in the face, neck, chest and right hand, with pellets perforating his lungs, trachea and thorax. Under these circumstances, there is no basis for a finding that defendant merely "consciously disgard[ed]" a substantial and unjustifiable risk, N.J.S.A. 2C:2-2b(3). His awareness was that of certainty "that his conduct [would cause the] result." N.J.S.A. 2C:2-2b(2), rather than a probability.
In our view, there was no rational basis for a verdict to convict defendant of a lesser-included offense of manslaughter. Accordingly, Judge Feinberg properly declined to charge on these lesser-included homicides. See State v. Martin, 213 N.J. Super. 426 (App.Div. 1986) where defendant set fire to a building in which he knew there were intoxicated people, with an intent to "get them", his action supported a conviction of "purposeful murder"; State v. Hollander, supra, where a pathologist's proof that death was caused by "forced asphyxiation by something over the face for at least three to seven minutes" was held incompatible with a reckless manslaughter charge, thus the defendant was not entitled to a manslaughter charge; State v. Micheliche, 220 N.J. Super. 532 (App.Div.), certif. den. 109 N.J. 40 (1987) where there was no basis to charge lesser-included offenses of aggravated or reckless manslaughter *244 because of defendant's voluntary intoxication and the "appalling severity of the victim's beating", id. at 543.
Moreover, it is clear that defendant was acting in concert with the co-defendant Columbie and was an accomplice in the commission of the crime, see State v. Palacio, 205 N.J. Super. 256, 262 (App.Div. 1985), and that each, therefore, was equally answerable for the conduct of the other. N.J.S.A. 2C:2-6b(2), (3), (4), (c)(1)(b). See also State v. Madden, 61 N.J. 377, 383 (1972); State v. Micheliche, 220 N.J. Super. at 544; State v. McKiver, 199 N.J. Super. 542, 548-49 (App.Div. 1985).

II
In his third issue, defendant argues that the trial court erred in denying his motion for severance. He contends that "[a] severance should be granted when the defenses of several defendants jointly indicted are antagonistic to one another," citing 5 Wharton's Criminal Law and Procedure (Anderson 1957), § 1946 at 58; see Annotation, "Antagonistic Defenses as Ground for Separate Trials of Co-Defendants in Criminal Cases" 82 A.L.R.3d 245 (1978). Defendant points out that his testimony was such that only defendant Columbie could have shot Castillo while co-defendant Columbie's testimony was such that only defendant could have shot Castillo. Defendant argues the denial of the severance in this matter prejudicially pitted each defendant against the other.
The State contends that the joint trial of both defendants was proper because the substantive offenses charged against the co-defendants arose out of the same criminal action and thus the initial joinder was proper, citing State v. Kropke, 123 N.J. Super. 413, 418 (Law Div. 1973). See also R. 3:15-1; State v. Bellucci, 165 N.J. Super. 294 (App.Div. 1979) mod. and aff'd 81 N.J. 531 (1980).
The grant or denial of a motion for severance is entrusted to the sound discretion of the trial court. R. 3:15-2; State v. Laws, 50 N.J. 159, 175 (1967) (denial of pretrial motions for *245 severance by defendants in murder prosecution held proper exercise of court's discretion) reargument 51 N.J. 494, cert. den. 339 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); State v. Belluci, supra. Denial of such a motion will not result in a reversal unless there is a showing of prejudice or a mistaken exercise of the trial court's discretion. State v. Morales, 138 N.J. Super. 225, 229 (App.Div. 1975). A separate trial should not be granted merely because it would offer defendant a better chance of acquittal. Id. at 231.
Here, Judge Feinberg denied defendant's motion for a severance because the State was not relying on prior statements made by either of the defendants. R. 3:15-2. In view of this, defendant's reliance on several cases from sister states and treatises is misplaced since they involve confessions and statements made by co-defendants prior to trial. E.g. Day v. State, 196 Md. 384, 76 A.2d 729 (1950) (denial of severance improper after court knew evidence would consist of statements by each defendant inculpating the other); Murray v. State, 528 P.2d 739 (Okla. Crim. App. 1974) (denial of motion for severance improper where defendants' confessions were mutually antagonistic and each defendant had no choice but to take the stand and defend against the others confession). The same rule prevails in New Jersey. State v. Barnett, 53 N.J. 559 (1969); see State v. Broxton, 49 N.J. 373 (1967); State v. Johnson, 31 N.J. 489 (1960). The reason for the rule requiring severance of trials of two defendants in which the State intends to introduce a confession or admission of one defendant which inculpates another defendant is that the statements, standing alone, cannot be cross-examined. State v. Guibilio, 139 N.J. Super. 251 (Law Div. 1976).
In considering a motion for severance, the trial court is required to balance the potential prejudice to defendant's due process rights against the State's interest in judicial efficiency. State v. Coleman, 46 N.J. 16, 24 (1965), cert. den. 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966). In the absence of prejudice, *246 the decision of the trial judge must stand. State v. Morales, supra, 138 N.J. at 229. The "danger by association", which adheres in all joint trials, is not in itself sufficient to justify a severance if the jury is properly instructed on the separate status of the co-defendants. State v. Freeman, 64 N.J. 66, 68 (1973); Pressler, Current N.J. Court Rules, (1987) Comment 2, R. 3:15-2(b).
Recently, in State v. Brown, 219 N.J. Super. 412 (Law Div. 1987), Judge Hoffman reviewed the law in New Jersey as well as several leading cases from other jurisdictions. There, two defendants were playing a "cat and mouse game" while driving two automobiles, resulting in an accident and fatality of a third driver. He held that, although the defenses asserted by the two defendants were antagonistic, they were not irreconcilable or mutually exclusive. In so holding, Judge Hoffman relied upon the standards set forth in United States v. Berkowitz, 662 F.2d 1127, (3rd Cir.1981). In Berkowitz, the Court of Appeals held that defendant "must demonstrate that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection." Id. at 1132.
After analyzing the federal case authority on the issue of severance of trial of co-defendants, the Court in Berkowitz summarized factors to be considered:
Synthesizing these decisions, we hold that the defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant. In such a situation, the co-defendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists "`that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" United States v. Eastwood, 489 F.2d 818 n. 5 (5th Cir.1973) (quoting United States v. Robinson, 432 F.2d 1348, 1351 (D.C. Cir.1970)). If the essence of one defendant's defense is contradicted by a co-defendant's defense, then the latter defense can be said to "preempt" the former. See United States v. Swanson, 572 F.2d 523, 529 (5th Cir.), cert. den. 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978) (no severance required because defense of noninvolvement did not "preempt" defense of lack of intent). This sort of conflict between defendants creates the *247 compelling prejudice that mandates severance. Such compelling prejudice does not arise with respect to a defendant where the conflict concerns only minor or peripheral matters which are not at the core of his defense. Ultimately, the test is whether the defendant receives a fair trial. [Emphasis supplied.]
The cases are not consistent on the question of the sufficiency of a ground for severance of one defendant attempting to escape conviction by placing the guilt on his co-defendant. See Annotation, supra, 82 ALR 3rd §§ 3-11 at 251-267. In applying the balancing test of prejudice to the defendant and the public interest in joint trials, courts have considered other factors in upholding a denial of severance. For example, where the evidence against each defendant was virtually identical, the case against each defendant exactly the same, and there was no showing that the trial unfairly prejudiced the movant defendant even though the respective defenses may have been "mildly" antagonistic, denial of a severance has been upheld. Commonwealth v. Morales, 508 Pa. 51, 494 A.2d 367, 372-73 (1985); see also State v. McGraw, 366 So.2d 1278, 1285 (La. 1978) (in murder prosecution where co-defendant testified that defendant was solely responsible but there was substantial competent evidence of defendant's guilt apart from the co-defendant's testimony); People v. Romeo, 112 A.D.2d 1015, 493 N.Y.S.2d 15 (2d Dep. 1985) (State's case was based on a theory that the defendants were acting in concert and each defendant was charged with responsibility for death of the victim); State v. Cook, 48 N.C. App. 685, 269 S.E.2d 743 (1980) petition den., 301 N.C. 528, 273 S.E.2d 456 (1980) (defendants were acting in concert and each defendant was charged with responsibility for death of the victim), and State v. Tarvis, 465 A.2d 164 (R.I. Sup.Ct. 1983) (one defendant could be held responsible as an aider and abettor to the other defendant's criminal actions and defendant could be found guilty as principal regardless of co-defendant's passivity).
In the present case, neither defendant made prior statements incriminating the other. Each defendant was subjected to cross-examination regarding his testimony. Each defendant's *248 testimony placed both of them at the scene of the crime. However, in attempting to minimize participation in the homicide itself, each defendant testified that it was the other who possessed the weapon and may have shot the victim Castillo. Neither defendant produced hostile witnesses against the other defendant and there was substantial evidence, apart from the testimony by each defendant, to sustain the conviction. Any prejudice to the defendant by co-defendant Columbie's assertion that defendant was the one who had access to the weapons and shot Castillo is diminished by the State's witnesses, all of whom testified to seeing both defendants enter the premises with weapons.
Moreover, since the evidence indicated that defendant and Columbie were acting in concert with one another, the acts of each would therefore have been the acts of the other. N.J.S.A. 2C:2-6a and b(3). State v. Madden, supra, 61 N.J. at 383; State v. Micheliche, 220 N.J. Super. at 544.
In view of the foregoing, we are satisfied that Judge Feinberg did not abuse his discretion in denying severance of defendant Sanchez' trial from that of co-defendant Columbie.

III
Under his second issue, defendant contends that his admission regarding the ownership of a suitcase when he was arrested on the fifth floor apartment at 691 Elizabeth Avenue, Newark, should have been excluded because it was prior to having been read his Miranda[4] rights and was made in response to a detective's custodial interrogation. When the detective pursued Columbie's girlfriend, Carmen Rivera, to the apartment on the fifth floor, upon entering the apartment, the detective noticed two suitcases by the door. After arresting defendant, he asked another occupant, Josephine Ortiz, whose suitcases they were to which she responded that they belonged *249 to co-defendants Columbie and Sanchez. Sanchez then "blurted out" that one of the suitcases was his.
There is no merit to defendant's contention: the response was to an open-ended, single, general question not directed solely to defendant, was unrelated to the arrest, was not an essential part of the investigation, was not a custodial interrogation, did not call for an admission of guilt, and the statement was therefore admissible. State v. Barnes, 54 N.J. 1 (1969), cert. den. 396 U.S. 1029, 90 S.Ct. 580, 24 L.Ed.2d 252 (1970); State v. Sessions, 172 N.J. Super. 558 (App.Div.), certif. den. 85 N.J. 108 (1980). The detective testified he directed his question to Ms. Ortiz and not defendant. It was the only question asked and defendant was under no compulsion to answer.

IV
Under the defendant's fourth point, he contends the trial judge committed reversible error by admitting photographs of the victim in evidence. Several of the photographs were close-ups of the gunshot wounds on the victim's hand, chest cavity and face. The remainder of the pictures essentially showed the victim's body on the floor in the kitchen as the police found it when they entered the premises. Defendant contends the pictures were either not relevant or cumulative evidence and that the probative value is outweighed by the prejudicial effect.
The admissibility of photographs of the victim into evidence rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of a palpable abuse thereof. State v. Thompson, 59 N.J. 396, 420-21 (1971). Pictures of a murdered body are likely to cause some emotional stirring in any case, but that of itself does not render them incompetent. They become inadmissible only when their probative value is so significantly outweighed by their inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of *250 the basic issue of guilt or innocence. Id. at 421; State v. Micheliche, 220 N.J. Super. at 545.
The trial judge did not admit all the photos which the State proffered but rejected those which he thought were repetitive.
Defendant asserts that these photos were not necessary because the manner of the victim's death was not disputed, citing State v. Lamb, 134 N.J. Super. 575 (App.Div. 1975); State v. Walker, 33 N.J. 580 (1960). Our reversal in Lamb did not rest solely on the admission of the pictures but was also based on two other errors by the trial judge. Id. at 581-82. In State v. Walker, the Court held that since the photographs could only have been introduced to establish the cause of death and there was ample testimony to support this, there was no need to buttress the case with photographs. 33 N.J. at 596. Here the photographs were introduced to show the viciousness of the attack in order to establish purpose or knowledge to support the murder charge as opposed to a manslaughter conviction.
The fact that photographs may be cumulative evidence does not justify their exclusion. State v. Smith, 32 N.J. 501, 525 (1960); cert. den. 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961); accord, State v. Belton, 60 N.J. 103, 109 (1972). Although all pictures of a murdered body are likely to be unpleasant and cause emotional stirring, that of itself does not render them inadmissible. Micheliche, 220 N.J. Super. at 545 citing State v. Thompson, 59 N.J. 396, 420 (1971). In the present case, defendant contends that he is not guilty of a knowing or purposeful homicide but rather, at best, he could be guilty of only one of the three varieties of manslaughter. The photographs were properly admitted to negate any inference that the degree of culpability of defendant was anything less than a knowing or purposeful homicide. As stated in Micheliche, 220 N.J. Super. at 545:
The State had assumed the burden of showing a purposeful and knowing murder, and the fact that the photographs were gruesome in their revelations does not detract from the fact that they were legitimately a part of the State's proof of defendant's criminal state of mind. From them the jury could infer *251 that the attack was performed with such convulsive ferocity that it could only have been the product of a knowing purpose to cause death. We therefore find no merit to this contention.

V
Lastly, under Point V, defendant contends the trial court erred in limiting the scope of his cross-examination of State witnesses, particularly Juan Bultron, concerning his ability to identify the individuals, including defendant, at the scene of the crime and the witness' ability to recall the incident.
The right to cross-examination does not mean that the cross-examiner has a license to roam at will under the guise of impeaching the witness. The trial judge has broad discretion to determine the proper limits of cross-examination of a witness whose credibility is in issue. State v. Pontery, 19 N.J. 457, 472-73 (1955); State v. Zwillman, 112 N.J. Super. 6, 18 (App. Div. 1970), certif. den. 57 N.J. 603 (1971).
In David v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court held that cross-examination, while a principal mechanism to test the believability and truthfulness of a witness, is always subject to the broad discretion of the trial judge to preclude repetitive and unduly harassing interrogation. Id. at 316, 94 S.Ct. at 1110; accord, State v. Vaccaro, 142 N.J. Super. 167, 176 (App.Div. 1976).
Under Evid.R. 4, the trial court may exclude evidence which may be considered too remote, unduly prejudicial, or result in confusion or mislead to the jury. It is within the discretion of the trial court to exclude remotely relevant evidence, the probative value of which is offset by the danger of undue prejudice, unfair surprise, undue consumption of trial time, or the possible confusion of an issue attendant in the introduction of collateral matter. Stoelting v. Hauck, 32 N.J. 87, 103 (1960).
Here defendant admitted that there was indeed a homicide, that he was present at the time of the homicide, that although he did not have the gun, co-defendant Columbie had a gun and *252 that both left after the shooting. The witness Bultron unequivocally stated that he knew defendant from his prior visits to the apartment.
Under the facts and circumstances of this case, we find no error by the trial judge in limiting the cross-examination of witnesses.
Affirmed.
NOTES
[1] This matter has been calendared back to back with State v. Columbie, (A-3209-84T4), which arises out of the same incident and involves a co-defendant.
[2] In adopting the Code, the Legislature adopted the objective level of responsibility. State v. Grunow, 102 N.J. 133, 140, 141 (1986).
[3] The New Jersey Penal Code categorizes aggravated manslaughter as conduct which "is committed recklessly under circumstances manifesting an extreme indifference to the value of human life." N.J.S.A. 2C:11-4a. However, the Model Penal Code classifies this type of conduct as reckless murder. 2 Model Penal Code and Commentaries, Part 2 (MPC), (1980) § 210.2(1)(b), at 13, 21. See State v. Grunow, 102 N.J. at 139 citing Knowlton, Commentaries Upon The New Jersey Penal Code, 32 Rutgers L. Rev. 1, 9 (1979).
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).