**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0967-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHAEL J. DOCE,

    Defendant-Appellant.

_____

Argued November 18, 2019 – Decided May 7, 2020

Before Judges Fasciale, Rothstadt, and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 15-07-0801.

Eric R. Breslin argued the cause for appellant (Duane Morris, LLP, attorneys; Eric R. Breslin and Melissa S. Geller, of counsel; Sarah Fehm-Stewart, on the briefs).

Nancy A. Hulett, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for respondent (Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney; Nancy A. Hulett, of counsel and on the brief).

PER CURIAM

Defendant Michael J. Doce appeals from the Law Division's October 5, 2017 judgment of conviction that was entered after a jury found defendant guilty of conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C11-3(a)(1), and murder N.J.S.A. 2C:11-3(a)(1), (2). The trial court sentenced defendant to thirty years imprisonment without parole eligibility.

On appeal, defendant challenges his conviction by arguing that his constitutional right to a speedy trial was violated; the trial court improperly admitted certain photographs into evidence; and he was deprived of a fair trial as a result of various acts and omissions committed by the prosecutor. He also contends that the cumulative errors in his trial warrant a reversal. For the reasons that follow, we remand defendant's speedy trial claims to the trial court as they were not addressed by that court in the first instance but affirm as to all other issues.

I.

The facts established at defendant's trial that lead to his conviction are summarized as follows. On November 6, 2011, defendant's codefendant, Daniel

Medaglia murdered K.D.[1]  As the jury found, Medaglia did so at the direction

of defendant, whom he had met about two years earlier.  According to Medaglia,

he committed the murder in an attempt to become involved in and "move up the

ladder" of an established, well-known New Jersey organized crime "family" that

defendant told Medaglia he was a prominent member and could help Medaglia

become a member.[2]

At the time Medaglia and defendant met, they were both involved in the

illegal sale of prescription drugs and made purchases from each other.  Several

months after they met, defendant told Medaglia that his "Uncle Paulie" was the

head of the crime family, and as an underboss, he was a high-ranking member,

_____

[1]  Medaglia and K.D. had been friends.  They grew up in the same town and attended the same high school.  They remained friends after high school and were both evidently involved with selling drugs to each other.

[2]  As discussed below, at trial, defendant asserted a defense explaining that his representations were part of a role-playing activity in which he and his friends participated.  Such activities are akin to "LARPing," (Live Action Role Playing), "a type of role-playing game in which each participant assumes a particular character and acts out various scenarios at events which last for a predetermined time."  LARP, Collins English Dictionary Online, https://www.collinsdictionary.com/dictionary/english/larp (last visited Apr. 21, 2020); see also People v. Linton, 302 P.3d 927, 945 (Cal. 2013) (discussing the testimony about a "leader of a live action role-playing game club" in a murder trial).

A-0967-17T4

and he could help Medaglia climb the ladder in the crime family. Defendant told Medaglia that "Uncle Paulie" could help Medaglia set up his "own loan sharking and bookie operation." Medaglia "wanted to get in close with [defendant] after he said he was a member" of a crime family because Medaglia was attracted to the "[m]oney, cars, things of that nature."

During 2010 and early 2011, Medaglia spent almost every day with defendant and they would discuss the crime family's activities. Defendant also introduced Medaglia to several individuals who were members of that family or had connections to the family. Medaglia started receiving text messages from an unidentified number and an individual who claimed to be one of the crime family's members.

By March 2011, Medaglia and defendant's relationship "was escalating" and Medaglia considered defendant "one of the most important people in [his] life." Around that time, defendant informed Medaglia that he was going to start asking Medaglia to do things for him, and Medaglia was willing to do "basically anything [defendant] said."

Later, defendant told Medaglia that he would arrange to get him more involved. Thereafter, Medaglia received a telephone call from someone, who sounded like an "older Italian guy," who said that he had "heard good things

about" Medaglia from defendant and that he was "going to set [Medaglia] up in [his] own thing pretty soon." Defendant promised to help Medaglia get a job as a bouncer at a strip club that he "had control over," and he would introduce Medaglia to the managers, who were also members of the family.

Through his developing relationship with Medaglia, defendant met K.D., who sold him drugs when Medaglia was not available. Thereafter, on one occasion, police officers followed K.D. as he drove to Medaglia's parent's house. After that incident, Medaglia stopped spending time with K.D. because he was upset that K.D. "got [them] jammed up in this little . . . run from the police." However, initially, defendant offered to help K.D. by using the connections he had to a prosecutor and the police, and stated that he could get the charges against K.D. dropped if K.D. paid him $500. K.D. told Medaglia that he was not going to pay defendant because he did not believe defendant had a connection or was really part of the crime family.

Defendant started calling K.D. a "snitch" and believed that K.D. told authorities about his drug sale operation. Medaglia was concerned about getting caught because he had friends who had recently been arrested for drug sales. Defendant worried that if Medaglia was arrested as a result of K.D. being a snitch, then defendant could be arrested as well.

5

Defendant began to frequently discuss with Medaglia the possible solution to "take [K.D.] out." Starting in March and April 2011, defendant "constant[ly]" pressured Medaglia to kill K.D., and the pressure continued "basically up until November 6, 2011," when Medaglia committed the murder.

When discussing the planned murder, Medaglia became worried that he also would be killed. He began receiving phone calls from a restricted number from an individual again claiming to be "Uncle Paulie" who told him that K.D. "got us all jammed up," "that he was putting a $50,000 hit on [K.D.'s] head," and that it was Medaglia's "job to handle the situation." Similarly, defendant told Medaglia he would be paid once he completed the hit, and that he could be "liable" if he did not take care of the situation.

Several months prior to the murder, when Medaglia was driving with defendant, he pointed out a terminal to Medaglia, and said it was a "bad place" where murders happened, and that defendant "had personally killed nine people and buried [their] bodies there." Defendant said that when the crime family had to kill people, they did it there and that Medaglia would "have to do it alone [the] first time." Defendant also told Medaglia that a family member named Phil or Steve would help with digging holes and ensuring Medaglia was clean afterwards. Eventually, they began to specifically discuss Medaglia taking K.D.

A-0967-17T4

to the terminal to kill him there. Medaglia asked defendant what he would use, and defendant told him he would "give [him] a sharp knife."

On November 5, 2011, the day prior to the murder, Medaglia was with K.D. at a motel. Medaglia texted defendant a number of messages stating that Medaglia wanted "to do this for real." In response, defendant told Medaglia "[f]ine" but that he was "not getting dirty" and would have someone prepare a hole to bury K.D.'s body. Medaglia told defendant he did not have a "piece" (referring to a handgun), and defendant responded to "use a blade. No noise."

While Medaglia waited for defendant to go to the terminal, Medaglia and K.D. went to a bank nearby the motel and K.D. withdrew $500 because Medaglia had told him they were going to purchase drugs. Ultimately, the murder did not occur that day because defendant did not come to the motel and Medaglia felt he "needed more direction" because he was not "sure what to do."

The following afternoon, Medaglia texted defendant that K.D. was picking him up and that he "want[ed] to handle this now." K.D. picked Medaglia up from his parent's house, and the two men went to a shopping mall. While there, Medaglia texted defendant a reference to the terminal, saying he was about to take K.D. to a "Giants game alone" and wanted defendant to call him. At 3:49 p.m., Medaglia and K.D. were still at the mall "wasting time until [Medaglia]

7

received further directions" from defendant.

Defendant and Medaglia exchanged additional text messages, and then Medaglia asked if he could bring K.D. to the "game" at 4:23 p.m. Defendant responded with the following:

> You can, but you have to go alone. In the back is a river, my dad's yacht is in the water. Go to the dock. We always have rope and concrete blocks . . . there. Tie him and put him in the water behind the back of the boat. The crabs will eat him in two days. Put the car in drive into the river too. I'll . . . have someone go there now to make sure you have cover.

Medaglia also asked defendant for directions on where to go once he arrived at the terminal, defendant told him where to park, and then to "[c]lock [K.D.] and either take [the] car or put [it] in [the] water." Medaglia told defendant that he wanted to show defendant that he could "hold it down" and that he was going to make him proud. Defendant texted in response "'[y]es' with exclamation points."

At 4:53 p.m., Medaglia texted defendant with his plan to come up behind K.D. and hit him. Defendant reminded Medaglia to make sure he deleted every text message and said, "[s]o help you God if you don't I'll make sure you're swimming too." Defendant followed up with another text a few minutes later that read, "Be quick. Clock to the back. Water. Car. Out."

A-0967-17T4

Medaglia and K.D. stopped at a gas station, and Medaglia continued to text defendant updates of his location. K.D. also withdrew money from an ATM at the gas station for the drug deal K.D. believed was going to occur.

Defendant texted Medaglia, to make sure he was ready and told Medaglia he did not "have to prove anything," to "[t]hink about it first," and not "do something [he would] regret." He also texted: "If you really are ready, you have to do it alone the first one. . . . We all did. Steve will clean it up. You have to get the hell out fast. Take the car. "

Medaglia texted a series of follow-up messages asking what to do with K.D.'s car, and defendant responded, "Steve will be there, just get to the water. Lights off. Get out. Do your thing. Water. Car. Out." Medaglia again asked, "[o]ut in what car [defendant]?" Defendant texted Medaglia, "[t]ake it home and hide it or drive right into water. You can even keep [him] inside and roll it in. So what's your plan? What are you going to do?" Medaglia told defendant that his plan was to drive the car into the water and "have Steve give [him] a ride."

When it was "dark enough," Medaglia texted defendant that he was leaving the gas station. Defendant asked Medaglia to reiterate his plan, and Medaglia told defendant that he was going to get "out with the pipe," "walk[]

around [the] back of [the] car and get[] him."

Defendant reminded Medaglia to delete the messages, asked if he had gloves, and told him to take K.D.'s "[w]allet, keys, . . . insurance, and registration." Medaglia told defendant, "Bro, I got this." Defendant answered with a text message that stated, "Steve is on top of building. First thing once you're done is he'll check your phone, make sure everything is clear, everything. Lift your shirt up and then . . . run towards [the convenience store], he'll scoop you from there." At 5:27 p.m., defendant told Medaglia that Steve was there, and Steve said that "he's got you."

On November 6, 2011, Medaglia killed K.D. at the terminal at some point between 6:32 p.m. and 7:02 p.m. At that time, K.D. and Medaglia got out of the car, Medaglia hit K.D. "from behind with [a] crowbar," and searched K.D.'s car for keys so that he could put the car into the water. When he could not locate the keys, he decided he "should get out of there," leaving K.D.'s body on the ground.

After the murder, Medaglia went to the nearby convenience store and contacted another codefendant, Ryan Morrell. When Morrell arrived, Medaglia told him that he had killed K.D. The two men went to a department store, Medaglia changed his clothes and boots, and put his bloody clothes in Morrell's

10

trunk. The two men then went to the strip club because defendant had told Medaglia that if anything should happen to him, he should go there "since it was under his control and contact Robert [or] Vinny and let them know something had happened to him [so that] they [could] handle it."

Medaglia followed defendant's instructions. He spoke to someone at the strip club. Afterwards, a "lightbulb went off that this might have been a whole scam the entire time" because the man he spoke to acted like he did not know defendant.

The two men then went to Morrell's house and burned Medaglia's clothes in the backyard. Medaglia stayed at Morrell's house that night and then Morrell brought Medaglia back to his parent's home the next day. Medaglia went to a motel the following night.

K.D.'s body was discovered by a contractor who arrived at the terminal at 4:15 a.m. on November 7, 2011. In the area of K.D.'s body, there were large storage containers and two pickaxes. One pickaxe was placed against one of the storage containers and the second pickaxe was found on top of dense brush and shrubs and had "a substantial amount of blood" on it.

The police discovered the car was registered to K.D.'s mother and found his driver's license in his pocket. Officers discovered three cell phones in K.D.'s

11

car.  The police also obtained footage from a surveillance camera of the area, which depicted "a male . . . wearing a jacket, skull cap, jeans, and white sneakers," walking between K.D.'s Subaru and a dump truck.  Officers later determined that Medaglia was the man in the surveillance video.

Police later obtained a text message log, which brought the officers' attention to a second phone number that they eventually learned belonged to defendant.  Police arrested Medaglia and defendant on November 9, 2011.

A grand jury indicted defendant, Medaglia, and Morrell.  The indictment charged defendant with conspiracy to commit murder, murder, and other related charges.  During the ensuing six years before defendant's trial, he filed a variety of pre-trial motions.  Additionally, three years after the original indictment, a grand jury returned a superseding indictment adding additional charges and an additional codefendant.[3]  Thereafter, before defendant's trial, Medaglia pled guilty to murder, Morrell pled guilty to a disorderly person's offense of hindering apprehension, and as part of their agreements, the two agreed to testify for the State against defendant.  Further, prior to defendant's trial, the trial court

---

[3]  The superseding indictment added additional charges relating to the unlawful possession of controlled dangerous substances and theft that occurred between January 1, 2009 to November 7, 2011.  The indictment also amended the conspiracy charge to have occurred between March 2011 to November 7, 2011.

severed the charges in the superseding indictment that were unrelated to the two charges arising from K.D.'s murder.

At trial, among the other witnesses, Medaglia and Morrell testified to the events leading to their arrest and indictment as set forth above. Defendant also testified, telling a different story. Defendant testified that Medaglia introduced him to K.D. in 2010 and had been in K.D.'s presence only "between five and ten times." He explained that he did a favor for Medaglia and K.D., when he offered to reach out to his family lawyer to try to handle the ticket following the convenient store incident. He denied demanding $500 from K.D. or speaking with a prosecutor and the police about dropping K.D.'s charges.

Defendant admitted that he told Medaglia that he was a member of organized crime, but he denied actually being a part of organized crime. He said that the story "actually started itself," when early in their friendship, Medaglia began to question defendant because defendant "had a good job" and had "nice things." Medaglia asked him whether he was involved with a crime family and defendant eventually told him that he was.

Defendant said that it was a "little thing" that "evolved into this elaborate [crime family] game." He and about six other friends were "in on this [crime family] game," and they "created many characters." Defendant pretended to be

one of the "main characters," "Uncle Paulie," and called Medaglia as that character on more than one occasion. Defendant did not think that Medaglia actually believed him but said that Medaglia "became very excited."

Defendant told Medaglia that the crime family had taken "countless bodies" to the terminal, but denied having any personal knowledge of bodies being buried there. Defendant said that he never intended any harm to come to K.D. When defendant learned that K.D. had been killed, he went alone to the police and gave "a four-and-a-half-hour statement" to two detectives. Defendant told the detectives that he was "role-playing" and explained the general parameters of "the game."

As noted, the jury convicted defendant of the two crimes and the trial court imposed its sentence. This appeal followed.

On appeal, defendant argues the following points:

POINT I

[DEFENDANT] WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.

A. THE EXTREME DELAY FROM ARREST TO TRIAL WEIGHS IN FAVOR OF VACATING THE CONVICTION.

B. THE 2[]050 DAY DELAY IS ATTRIBUTABLE TO THE STATE AND COURT'S CALENDAR.

14

1. NOVEMBER 9, 2011 – MAY 30, 2012 (203 DAYS; JUST UNDER SEVEN MONTHS).

2. MAY 31, 2012 – JUNE 30, 2013 (396 DAYS; 13 MONTHS).

3. JULY 1, 2013 – SEPTEMBER 2, 2014 (429 DAYS; FOURTEEN MONTHS).

4. SEPTEMBER 3, 2014 – JULY 4, 2015 (305 DAYS; 10 MONTHS).

5. JULY 5, 2015 – JANUARY 7, 2016 (187 DAYS; SIX MONTHS).

6. JANUARY 8, 2016 – MAY 1, 2017 (480 DAYS; JUST UNDER SIXTEEN MONTHS).

7. MAY 2, 2017 – JUNE 20, 2017: TRIAL.

C. [DEFENDANT] VIGOROUSLY ASSERTED HIS SPEEDY TRIAL RIGHT.

D. [DEFENDANT] SUFFERED SUBSTANTIAL PREJUDICE AS A RESULT OF THE DELAY.

POINT II

THE COURT IMPROPERLY PERMITTED THE INTRODUCTION OF CRIME SCENE AND AUTOPSY PHOTOGRAPHS.

POINT III

DISCOVERY VIOLATIONS AND IMPROPER PROSECUTORIAL COMMENTARY DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

      A.    THE STATE FAILED TO PRODUCE A KEY PIECE OF EVIDENCE.

      B.    THE STATE FAILED TO PRODUCE A WITNESS LIST.

      C.    THE STATE ATTEMPTED TO INTRODUCE 404(b) EVIDENCE NOT DISCLOSED TO THE DEFENSE AND WHICH HAD BEEN EXCLUDED BY PRIOR RULINGS.

      D.    THE PROSECUTOR ENGAGED IN INAPPROPRIATE COMMENTARY IN SUMMATION.

POINT IV

CUMULATIVE ERROR DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

II.

Speedy Trial

We begin our review by addressing defendant's speedy trial claims. Defendant argues that his constitutional right to a speedy trial was violated because 2050 days elapsed from the date of his arrest to the date of the jury's verdict, and that the delay warrants a vacating of his conviction. While we

16

acknowledge that the delay here was extensive, we are constrained to remand to the trial court for consideration of defendant's contentions because the trial court never specifically addressed the issue.

From the date of defendant's arrest in November 2011 through the date his trial commenced in May 2017, defendant remained free on bail until his conviction. During that time, it appears that many of the delays were the result of the parties engaging in extensive pretrial litigation. There were numerous motions that were filed relating to discovery, especially about information obtained from cell phones. Defendant filed motions to sever, dismiss, and to exclude certain evidence at trial. He also asked the court to consider his request to waive his right to a jury trial. Many of the motions were adjourned at the State's request. In response to some of the motions, the trial court conducted evidentiary hearings before making any rulings, including one that spanned several days and related to the State's handling of evidence about the subject cell phones. The guilty pleas entered by the codefendants and the return of the superseding indictment also contributed to the delay. Defendant also filed numerous motions in limine. In a June 23, 2015 e-mail to the court, defense counsel identified eight pending motions in limine awaiting resolution.

Despite defendant's filing of numerous motions, he never filed a formal

17

motion raising his speedy trial contentions.  However, in December 2016 his counsel sent a letter to the court that stated the following about defendant's right to a speedy trial.

> [Defendant] is not incarcerated.  Nevertheless, he retains his constitutional right to a speedy trial. Whether the speedy trial right is violated depends on four non-exclusive factors:  [T]he length of the delay, the reason for the delay, the assertion of the right by a defendant, and prejudice to the defendant.  State v. Cahill, 213 N.J. 253 (2013).  [Defendant] has not, to this point, asserted that right.  He does so now.  We object to any further delay of the trial based on the State's need to "prepare," or its failure to take the currently scheduled trial date into account.
>
> [(Emphasis added).]

During a hearing on January 7, 2016, addressing other matters, the trial court acknowledged that the case was not moving along "as expeditiously as" it would have liked, that it was "languishing in the system," and that "the only saving grace" was that defendant was not imprisoned.  The court also acknowledged that its own schedule required a further delay in the trial date. The trial court never made any findings with respect to any of the factors that must be considered when addressing a speedy trial claim.[4]  See Barker v. Wingo,

---

[4] Defendant also raised his right to a speedy trial in a letter on April 21, 2017, in response to a letter the State sent to the court on April 20, 2017 relating to an

407 U.S. 514, 530 (1972).

We disagree with the State's contention on appeal that defendant somehow waived his right to assert his speedy trial claims because he never filed a motion asserting them. Contrary to the State's argument, a defendant's failure to move to dismiss a complaint for unnecessary delay does not constitute waiver of a speedy trial claim, but rather, it is an element to be considered as to whether the defendant is entitled to such relief. See State v. Szima, 70 N.J. 196, 201 (1976); State v. Smith, 131 N.J. Super. 354, 365 (App. Div. 1974) ("[T]he oft[en]-repeated rule . . . that an accused waives his right to a speedy trial by failing to demand one, is no longer the law.").

A defendant's "failure to assert the right [to a speedy trial] will make it difficult for a defendant to prove that he was denied a fair trial." State v. Misurella, 421 N.J. Super. 538, 545-46 (App. Div. 2011) (alteration in original) (quoting State v. Le Furge, 222 N.J. Super. 92, 99 (App. Div. 1988)). But, a defendant need not make a formal motion to demand a speedy trial; rather, "Barker clearly implies that an accused's demand for prompt trial can be asserted

upcoming status conference. In the letter to the court, defense counsel pointed out that "this case has dragged on for a grueling five-and-a-half years, impacting [defendant]'s right to a speedy trial." The trial court never addressed the speedy trial issue.

by objection made to continuance[s] requested by the State, if he otherwise presents himself as ready, able and willing to proceed." Smith, 131 N.J. Super. at 364. A defendant's comments that he was "ready for trial" and "wanted it to occur sooner rather than later," are sufficient to assert his or her right to a speedy trial. State v. May, 362 N.J. Super. 572, 597 (App. Div. 2003). Courts may also consider "the frequency and force of the [defendant's] objections" when determining whether the defendant properly invoked his right. Barker, 407 U.S. at 529.

The right to a speedy trial is firmly established in the United States Constitution's Sixth Amendment. Id. at 515. This right "attaches upon [a] defendant's arrest." State v. Tsetsekas, 411 N.J. Super. 1, 8 (App. Div. 2009) (quoting State v. Fulford, 349 N.J. Super. 183, 190 (App. Div. 2002)). A speedy trial violation claim is analyzed under a four-part test set forth in Barker that weighs: (1) the "[l]ength of [the] delay"; (2) "the reason[s] for the delay"; (3) "[w]hether and how [the] defendant assert[ed the] right" to a speedy trial; and (4) the prejudice the delay caused to the defendant. Barker, 407 U.S. at 530-31. In Cahill, the New Jersey Supreme Court reaffirmed "that the four-factor balancing analysis of [Barker] remains the governing standard to evaluate claims of a denial of the federal and state constitutional right to a speedy trial." 213

20

N.J. at 258.

"None of the Barker factors is determinative, and the absence of one or some of the factors is not conclusive of the ultimate determination of whether the right has been violated." Id. at 267 (citing Barker, 407 U.S. at 533). "[T]he factors are interrelated, and each must be considered in light of the relevant circumstances of each particular case." Tsetsekas, 411 N.J. Super. at 10 (citing Barker, 407 U.S. at 533).

When delay exceeds one year, a court presumptively should analyze all of the Barker factors. Cahill, 213 N.J. at 265-66. The burden is on the State to "reasonably explain[] and justif[y]" any delays. State v. Farrell, 320 N.J. Super. 425, 450 (App. Div. 1999) (quoting State v. Detrick, 192 N.J. Super. 424, 426 (App. Div. 1983)). We have previously cautioned, however, against deciding "how long is too long . . . 'by sole reference to the lapse of a specified amount of time. . . .'" Detrick, 192 N.J. Super. at 426 (second alteration in original) (quoting Smith, 131 N.J. Super. at 360). Legitimate delays, "however great," will not violate the defendant's right to a speedy trial if it does not specifically prejudice the defense. Doggett v. United States, 505 US. 647, 656 (1992).

Additionally, longer delays may "be tolerated for serious offenses or complex prosecutions." Cahill, 213 N.J. at 265. A defense-caused delay does

not support a speedy trial violation and such delays are subtracted from the total calculus. United States v. Claxton, 766 F.3d 280, 294 (3d Cir. 2014) (citing United States v. Battis, 589 F.3d 673, 680 (3d Cir. 2009)); see also State v. Long, 119 N.J. 439, 470 (1990) ("[A]ny delay that defendant caused or requested would not weigh in favor of finding a speedy trial violation." (Quoting State v. Gallegan, 117 N.J. 345, 355 (1989))). Of course, purposeful delay tactics "weigh[] heavily against the" State. Barker, 407 U.S. at 531.

"The only remedy" for a violation of a defendant's right to a speedy trial "is dismissal of the charge." Cahill, 213 N.J. at 276. On appeal, "we reverse only if the court's determination is clearly erroneous." Tsetsekas, 411 N.J. Super. at 10.

Here, in response to defendant's appeal, we do not have the benefit of a comprehensive trial court decision that divides the overall delay into discrete periods and then explains and evaluates the reasons for delay in each of these time periods. See May, 362 N.J. Super. at 596. There are many circumstances to consider here, including but not limited to (1) the seriousness of the crimes; (2) the complexity and logistical challenges of an investigation that required forensic analysis of cell phone evidence; (3) new information leading to the superseding indictments; (4) new information obtained as a result of the

22

codefendants' guilty pleas; and (5) numerous pretrial motions defendant filed at all stages of the case.

It is impracticable for us to review this record and exercise original jurisdiction pursuant to Rule 2:10-5 to decide the ultimate question of whether defendant's right to a speedy trial was violated. See Tomaino v. Burman, 364 N.J. Super. 224, 234-35 (App. Div. 2003) (opining that appellate courts should exercise original jurisdiction "only 'with great frugality'" (quoting In re Boardwalk Regency Corp. Casino License Application, 180 N.J. Super. 324, 334 (App. Div. 1981))). Moreover, it is conceivable, if not likely, that the current record is not adequate to permit a fulsome review of the Barker factors. The circumstances explaining certain periods of delay, for example, may be outside the current record, in which event further factfinding may be necessary. Exercise of original jurisdiction is discouraged "if factfinding is involved." State v. Micelli, 215 N.J. 284, 293 (2013) (quoting State v. Santos, 210 N.J. 129, 142 (2012)).

We therefore believe review of the Barker factors is best delegated to the trial court in the first instance. A trial court is better suited than we are to undertake "the difficult task of balancing all the relevant factors relating to the respective interests of the State and the defendant[]," and to provide "subjective

23

reactions to the particular circumstances [to] arrive[] at a just conclusion." State v. Merlino, 153 N.J. Super. 12, 17 (App. Div. 1977).

Accordingly, we remand the matter to the trial court to (1) catalog and compartmentalize all of the discrete periods of delay; (2) determine and evaluate the specific reasons for delay; and (3) as to delay attributed to the State, determine whether the delay was the product of the case's complexity, some other legitimate justification, was the product of purposeful delay tactics, or mere inaction. The trial court should apply the Barker factors in light of those findings.

This analytical process "necessarily involves subjective reaction to the balancing of circumstances." Szima, 70 N.J. at 201. We leave it to the sound discretion of the trial court regarding the conduct of those proceedings, including whether testimony is necessary. Should the court conclude defendant's speedy trial right were violated, it shall vacate defendant's judgment of conviction and dismiss the superseding indictment.

## Admission of Photographs

We turn to defendant's next argument, asserting that the trial court improperly admitted five photographs taken during the victim's autopsy and one of his body at the crime scene because they were prejudicial. We conclude that

the photographs were properly admitted.

Prior to trial, defendant filed a motion in limine objecting to two hundred crime scene and autopsy photographs identified by the State because they lacked relevance, were cumulative in nature, and particularly gruesome, and therefore, prejudicial. The court rejected defense counsel's request to exclude all of the photographs. Ultimately the court allowed the State to offer ten photographs, but the State only asked for the six to be admitted.

One of the photographs admitted at trial depicted the victim's injuries in a closeup "of the left side of the victim's face"; another showed the victim's body taken near the victim's head, depicting the victim's injuries "to the left side of his face and . . . head"; another depicted the back of the victim's head shaved by the medical examiner, showing the victim's head injuries; another depicted injuries to the victim's right ear; another showed the cerebral hemispheres of the victim's brain, depicting the laceration inflicted upon it; and there was a photograph of the crime scene which contained the victim's body.

The record does not contain a specific written order or clear oral decision elaborating why the trial court admitted the photographs. However, at a status conference in April 2017, the court discussed the specific photographs of the victim and crime scene it would allow. When reviewing the autopsy

photographs, the court considered whether the photographs showed clear views of the victim's injuries and weighed the evidential value of photographs against the prejudice to defendant.

"We review a trial court's evidentiary rulings for abuse of discretion, but we review its legal interpretations de novo." State v. Melendez, 454 N.J. Super. 445, 460 (App. Div. 2018) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)), aff'd and modified, 236 N.J. 52 (2018); see also State v. Mann, 203 N.J. 328, 336-37 (2010). Where the issue relates to the admission of photographs, "[t]o demonstrate [an] abuse of discretion, the potential for prejudicial information must significantly outweigh the photos' probative worth, to the extent that the jurors are diverted 'from a reasonable and fair evaluation of the basic issue of guilt or innocence.'" State v. McDougald, 120 N.J. 523, 582 (1990) (quoting State v. Sanchez, 224 N.J. Super. 231, 250-51 (App. Div. 1988)).

The trial court has discretion to admit photographs of the victim. Ibid. If the photographs have some probative value, they may be admitted "even where cumulative and somewhat inflammatory." State v. Moore, 122 N.J. 420, 466-67 (1991) (quoting State v. Belton, 60 N.J. 103, 109 (1972)); see also State v. Micheliche, 220 N.J. Super. 532, 545 (App. Div. 1987) ("Although all pictures of a murdered body are likely to be unpleasant and cause emotional stirring, that

26

of itself does not render them inadmissible."); State v. Thompson, 59 N.J. 396, 421 (1971) (holding that autopsy photographs "are likely to cause some emotional stirring in any case, but that of itself does not render them incompetent"); State v. Huff, 14 N.J. 240, 251 (1954) ("Photographs of unpleasant and gruesome aspects of a murder case are not objectionable for this reason alone.").

Courts have allowed autopsy and dead body photographs where those photographs tended to prove a fact of consequence. See, e.g., State v. Morton, 155 N.J. 383, 455-56 (1998) (finding that autopsy photographs that corroborated testimony and supported inferences that defendant acted with the requisite mental state were relevant); State v. Marshall, 123 N.J. 1, 99 (1991) (finding that crime scene photographs of a victim's body and closeup autopsy photographs showing views of a victim's wound were not unduly prejudicial or inflammatory and "were relevant for the purpose of corroborating" a State witness's testimony about the crime scene's physical evidence, despite having "limited" probative value), superseded by statute on other grounds, N.J.S.A. 2C:11-3; Moore, 122 N.J. at 468-69 (holding that the court did not abuse its discretion in admitting autopsy photographs of a victim's "destroyed" head, where such photographs were relevant to defendant's state of mind); State v.

Abdullah, 372 N.J. Super. 252, 271 (App. Div. 2004) (holding that the court did not abuse its discretion in admitting gruesome photographs of victim's body because they demonstrated the ferocity of the attack), aff'd in part, rev'd in part on other grounds, 184 N.J. 497 (2005); Sanchez, 224 N.J. Super. at 249-51 (admitting closeup photographs of victim's gunshot wounds because they were relevant to establishing whether defendant acted with purpose or knowledge); Micheliche, 220 N.J. Super. at 545 (finding that even though photographs were "ghastly" and "gruesome" "they were legitimately a part of the State's proof of defendant's . . . state of mind" and were only admissible after "a careful selection process [was conducted] during which the judge excluded other[ photographs] . . . proffered by the State"); State v. Jordan, 197 N.J. Super. 489, 504 (App. Div. 1984) (finding nothing improper in admitting a photograph of a victim's wound).

Here, the State offered the photographs at trial, arguing they were relevant because they showed the "sheer brutality of the attack," which related to the elements of the crime establishing defendant's mental state, the nature of the injuries, and the cause of death. It also argued that the photographs corroborated Medaglia's testimony about his and defendant's roles in the conspiracy and murder.

The trial court considered each of the photographs proffered by the State, heard arguments presented by each of the parties, and limited the number of photographs that the State could admit. Even though the court's limitation on the number of admissible photographs does not necessarily justify their admission, it demonstrates the trial court exercised its discretion after careful consideration. See Micheliche, 220 N.J. Super. at 545.

We are not persuaded by the caselaw cited in support of defendant's argument that the photographs were improperly admitted. For example, unlike in defendant's case, in State v. Lockett, 249 N.J. Super. 428, 432-33 (App. Div. 1991), a death by automobile and manslaughter case in which we held that the photographs should have been excluded, the State was not required to prove intentional conduct. Here, the photographs were evidence of defendant's intentional conduct leading to K.D.'s murder. They demonstrated that Medaglia followed defendant's instructions to kill K.D. using blunt force, the nature of the attack, and K.D.'s injuries in a way the other proffered evidence, such as Medaglia's testimony, did not.

In another case cited by defendant, State v. Walker, 33 N.J. 580, 596 (1960), the Court held that photographs of a victim's brain should not be admitted during a retrial because the photographs "could only have been

introduced to establish the cause of death," for which there was already ample testimony and the cause of death was uncontested. Defendant contends that here too, because Medaglia confessed to killing K.D., the photographs should not have been admitted. But here, the indictment charged defendant with the crime of murder, which required the State to prove that defendant purposely and knowingly "cause[d the victim's] death or [a] serious bodily injury resulting in [the victim's] death." N.J.S.A. 2C:11-3(a)(1) to (2). The photographs of the victim were properly admitted to prove an element of the defendant's charged crime. See Moore, 122 N.J. at 268 ("Although photographs that tend to establish cause of death may be unnecessary where cause of death is undisputed, they may be admitted when relevant to 'the viciousness of the attack.'" (Quoting Sanchez, 224 N.J. Super. at 250)).

In the other case relied upon by defendant, State v. Johnson, 120 N.J. 263, 298-99 (1990), the trial court excluded "blood-spatter testimony" that involved a "lengthy presentation" that "extend[ed] over the course of an entire day," and included "numerous crime-scene photographs depicting the victims' bodies, as well as forty-two slides depicting blood-spatter exemplars, which [the witness] used to highlight his expertise in the area." The Supreme Court reasoned that although the testimony was relevant, it was "largely corroborative of other,

A-0967-17T4

essentially unchallenged testimony indicating the manner of death," and only "minimally probative of defendant's guilt." Id. at 298. It further stated that the testimony "could not help but focus the jury's attention on the gruesome details of the condition of the victims' bodies, rather than on defendant's guilt." Ibid.

However, in this case, the challenged evidence is much more limited in quantity and content. The five autopsy photographs and one crime scene photograph, showed violent injuries, but were not analogous to a witness's day-long presentation that included numerous photographs of the victims' bodies and blood spatters. Ibid.; see also Sanchez, 224 N.J. Super. at 250. Additionally, the admitted autopsy photographs of K.D. were taken after he was cleaned of his blood, and therefore, eliminated any undue gruesomeness even though they did show serious head injuries.

We have no cause to disturb defendant's conviction based upon the admission of the challenged photographs.

Prosecutorial Misconduct

Defendant also asserts he was deprived of a fair trial because the State failed to comply with its discovery obligations, provided a noncompliant witness list, elicited improper testimony, and made inappropriate remarks during summation. Defendant argues that each of these actions requires reversal and

31

dismissal of the charges against him, or in the alternative a new trial.  We disagree.

Discovery Issues

At trial, an investigating detective testified for the State about, among other things, a money clip found inside K.D.'s car at the crime scene.  The detective described the contents of the money clip, which included the ATM receipt for K.D.'s withdrawal of funds.  The State moved to have the money clip admitted into evidence.  Defendant objected and asserted that while defense counsel had seen photographs of the money clip, the State had neither produced the money clip in discovery nor provided a photocopy of the ATM receipt.  Counsel noted that it had "asked several times . . . in 2013 or 2014, for account records" to determine from where K.D. withdrew money, but it was the first time she was seeing the receipt.  The State responded that it had just forgotten to make a copy of the receipt.

In response, the trial court recessed to allow the defense to prepare its response to the receipt.  Upon return from the break, and outside the jury's presence, defense counsel informed the court that a lawyer's business card had also been in the money clip, which it had not previously seen. Counsel stated that it was "a little hard for [him] to say what [they] would have done with it,

32

what it would have shown [them]," but that "it would have been nice to see it." Counsel also indicated it may plan to call the attorney whose name was on the card.

The court recalled the detective to the stand (still outside the presence of the jury) and asked whether he knew anything about the lawyer's card. The detective stated he did not list the business card in his inventory of what he recovered from the crime scene because he did not find it relevant. The detective did not contact the attorney and was not aware if anyone else had contacted him.

The court offered to call the attorney at that time from the courtroom, but defendant declined and asked the court to just note the objection for the record. The defense did not request an instruction regarding this evidence, and the State continued to question the detective about the money clip and its contents. Defendant never called that attorney to testify during the trial.

On appeal, defendant argues that the State violated its discovery obligation by not producing the ATM receipt and the lawyer's business card until the middle of trial, even though the defense requested evidence related to "the ATM withdrawal for years." Defendant explains that this "necessitated significant revisions to the defense's strategy as it concerned . . . Medaglia." We find no merit to defendant's contentions.

33

We review a trial court's decision regarding the appropriate remedy for a discovery violation under an abuse-of-discretion standard. See State v. Utsch, 184 N.J. Super. 575, 580 (App. Div. 1982). We will reverse only if the State's discovery violation prejudiced a defendant by denying a fair trial. State v. Blake, 234 N.J. Super. 166, 172-73 (App. Div. 1989).

Rule 3:13-3(f) provides that if a party fails to comply with the discovery rules, the court "may order such party to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, . . . prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate." However, "[a]n adjournment or continuance is a preferred remedy where circumstances permit." State v. Washington, 453 N.J. Super. 164, 190 (App. Div. 2018) (quoting State v. Clark, 347 N.J. Super. 497, 509 (App. Div. 2002)). Dismissal for a discovery violation is a "drastic remedy [and] is inappropriate where other judicial action will protect a defendant's fair trial right[]." Clark, 347 N.J. Super. at 508.

When the evidence within the money clip became an issue, the trial court took a break in the proceedings to allow the defense to examine the additional evidence. Defendant argues he had to make significant changes to his strategy, however, he does not explain the change or how he was prejudiced. Upon return

34

from the break, the defense was unable to articulate to the court how the lawyer's card would have been incorporated by the defense, and the defense never called the attorney indicated on that card as a witness later in the trial. Moreover, there was no evidence that the State's actions were intentional. Cf. Blake, 234 N.J. Super. at 170-71 (holding that a defendant was deprived of a fair trial where the State did not disclose witnesses and their statements regarding the defendant's inculpatory statements, which would have impacted the defendant's decision to take the stand).

Additionally, defendant did not request a mistrial or any other specific relief at that time. In his brief to us, defendant acknowledges that during trial he had the option to move for a mistrial or to proceed and adjust the defense strategy. The defense chose to proceed "[g]iven the length of time that had passed."

We conclude that the trial court did not abuse its discretion, especially in light of defendant choosing not to seek any specific relief or accept the court's offer to address his concerns and his failure to articulate how the late disclosure caused him any prejudice. Under the circumstances, to the extent any error occurred, it was invited, barring defendant's claims on appeal, see State v. Williams, 219 N.J. 89, 101 (2014) ("The doctrine of invited error does not permit

a defendant to pursue a strategy . . . and then when the strategy does not work out as planned, cry foul and win a new trial."), as defendant cannot demonstrate how "the particular error . . . cut mortally into [his] substantial rights" so that it "cause[d] a fundamental miscarriage of justice." State v. A.R., 213 N.J. 542, 562 (2013) (first alteration in original) (first quoting State v. Corsano, 107 N.J. 339, 345 (1987); then quoting N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010)).

State's Witness List

Defendant also contends that the State violated its discovery obligation by producing a list of individuals with potentially relevant information but failing to designate which of those individuals it would call at trial as witnesses. Defendant does not argue that the State violated its obligation by failing to provide the list, but rather, it did so by providing a list of too many potential witnesses.

We find this contention to be "without sufficient merit to warrant discussion in a written opinion." R. 2:11-3(e)(2). Suffice to say that the prosecutor complied with Rule 3:13-3(b)(1)(F) that obligated the State to provide "names, addresses, and birthdates of any persons whom the prosecutor knows to have relevant evidence or information including a designation by the

36

prosecutor as to which of those persons may be called as witnesses." To the extent the prosecutor did not designate which individuals it would be calling as witnesses, defendant failed to demonstrate how that failure caused any prejudice to him.

### Admission of Rule 404(b) Evidence

Defendant next asserts that he was prejudiced when the prosecutor attempted to introduce evidence of prior bad acts that the trial court had previously excluded or was not previously disclosed. The first objectionable statement related to Medaglia's testimony that defendant told him that he had to go to Pennsylvania to pick up guns, but Medaglia never did so. The second statement was Medaglia's testimony that defendant "kept giving [him] promises of jobs, different operations and stuff that [defendant] would get [him] in on," which had "to do with different types of scams, loan sharking, [and] bookie operations." Defendant argues that the State improperly elicited testimony from Medaglia about hacking into police files to erase criminal records. Defendant additionally cites to Medaglia's testimony that defendant had been stealing pills from Medaglia, and that "in order to ingratiate [himself] with [defendant] and his family [he]'d have to kick up proceeds from [his] sale of illegal pills," which related to one of the charged crimes under the severed indictment.

37

At trial, when defendant raised objections to the specific testimony, or moved for a mistrial, the trial court responded by admonishing the prosecutor outside the presence of the jury, and in at least one instance, instructed Medaglia to refrain from mentioning the impermissible topics in his testimony. In each instance, the trial court also delivered a curative instruction to the jury telling it that the objectionable testimony had nothing to do with their consideration of the case and that it should not be considered at all in the jury's deliberations. For example, when addressing the testimony about hacking, the trial court stated the following to the jury:

> THE COURT: . . . . [W]hat is this case about? How many times am I going to have to say, this case is about murder, conspiracy to commit murder.
>
> So the testimony just now has to do about some other acts, bad acts that are not so, not part of this case. Right? So, there's no evidence that he was doctor shopping. He said he was doctor shopping. So, there's no information that any pharmaceutical records were hacked into. What's that all about? So, that's not part of this case. You strike that, because that's not part of this case. This case is about murder, conspiracy to commit murder. You will see cell phone evidence in this case or not in this case. Are we at the same page?
>
> THE JURY: Yes.

We conclude that although the challenged testimony was inadmissible, the trial court struck the objectionable evidence and delivered appropriate curative

instructions that were "firm, clear, and accomplished without delay," thereby "alleviat[ing any] potential prejudice to . . . defendant from [the] inadmissible evidence that . . . seeped into a trial." State v. Vallejo, 198 N.J. 122, 134-35 (2009). "While we agree that the conduct of the prosecutor complained of by defendant was improper and unjustifiable, we are also satisfied that any potential prejudice was avoided by the trial judge's prompt and firm curative instructions." State v. Hernandez, 334 N.J. Super. 264, 273 (App. Div. 2000), aff'd as modified, 170 N.J. 106 (2001); see also State v. McKinney, 223 N.J. 475, 497 (2015) (holding that a trial court is "permitted and encouraged to correct errors that occur during trial" by such means as a curative jury instruction).

Moreover, although the challenged testimony was inadmissible because it related to severed counts of the indictment or was previously excluded under Rule 404(b), the testimony did not prejudice defendant. Medaglia testified over the course of six days from May 23, 2017 to June 6, 2017, and defendant appeals four brief passing statements taken from Medaglia's lengthy testimony. There is also no evidence that suggests the jury was unable to follow the trial court's curative instructions. See State v. Catlow, 206 N.J. Super. 186, 193 (App. Div. 1985) ("The record reveals no reason to believe that the jury was unable to follow the court's sharp and complete curative instruction."). Under these

39

circumstances, we discern no prejudice to defendant, and therefore, no reason to disturb his conviction.

<u>Prosecutor's Improper Comments During Summation</u>

Defendant further argues that the prosecutor made improper remarks during summation that deprived defendant of a fair trial: (1) Medaglia "sent a text message saying that he wanted to kill himself instead of killing [K.D.]"; (2) Medaglia testified K.D. was a "snitch" and that the Drug Enforcement Agency was involved in the investigation; (3) since K.D. did not believe defendant was in organized crime, defendant wanted K.D. dead in fear that K.D. would tell Medaglia the truth; (4) the prosecutor made statements that mischaracterized defendant's testimony regarding his use of drugs; and (5) the prosecutor made comments about defendant's confession to a priest.

In our review, we "must assess the prosecutor's comments in the context of the entire trial record," <u>State v. Nelson</u>, 173 N.J. 417, 472 (2002), including whether the trial was lengthy and the prosecutor's remarks short or "errant," <u>State v. Engel</u>, 249 N.J. Super. 336, 382 (App. Div. 1991). Further, where a prosecutor's comments are "only slightly improper," a jury charge to the effect that statements during summation are not evidence and should be disregarded if they conflict with jurors' recollection of events "may serve to ameliorate

40

potential prejudice." State v. Frost, 158 N.J. 76, 86-87 (1999); State v. Ramseur, 106 N.J. 123, 323 (1987), superseded by statute on other grounds, N.J.S.A. 2C:11-3.

When the alleged misconduct involves a particular remark, a court should consider whether: (1) defense counsel objected in a "timely and proper" fashion to the remark; (2) the "remark was withdrawn promptly"; and (3) "the court gave the jury a curative instruction." State v. Smith, 212 N.J. 365, 403-04 (2012) (quoting Frost, 158 N.J. at 403); State v. Zola, 112 N.J. 384, 426 (1988).

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented," and they are "expected to make vigorous and forceful closing arguments to juries." Frost, 158 N.J. at 82. However, a prosecutor's wide latitude is not unfettered and the prosecutor's "remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved." State v. Williams, 113 N.J. 393, 447-48 (1988). Accordingly, "a prosecutor must refrain from improper methods that result in a wrongful conviction." State v. Smith, 167 N.J. 158, 177 (2001).

For example, a prosecutor commits misconduct if he or she "implies to the jury that he [or she] possesses knowledge beyond that contained in the evidence

41

presented, or if he [or she] reveals that knowledge to the jury." State v. Feaster, 156 N.J. 1, 59 (1998). A prosecutor similarly may not "declare his [or her] personal belief of a defendant's guilt" in a way that suggests such knowledge. State v. Farrell, 61 N.J. 99, 103 (1972). He or she also may not denigrate the defense. State v. Lazo, 209 N.J. 9, 29 (2012).

Even if a prosecutor is found to have made improper statements, it "does not end a reviewing court's inquiry; in order to merit reversal, the misconduct must have deprived the defendant of a fair trial." State v. Hawk, 327 N.J. Super. 276, 281 (App. Div. 2000). A reviewing court need only be concerned with whether "the remarks, if improper, substantially prejudiced the defendant['s] fundamental right to have the jury fairly evaluate the merits of [his or her] defense, and thus had a clear capacity to bring about an unjust result." State v. Johnson, 31 N.J. 489, 510 (1960).

The court should be "mindful that criminal trials create a 'charged atmosphere . . . [that] frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety.'" Ramseur, 106 N.J. at 320 (alterations in original) (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)). As such, the prosecutor's conduct must have been "so egregious," id. at 322, that it "substantially prejudiced [the] defendant's fundamental right to have a jury

fairly evaluate the merits of his defense." State v. Timmendequas, 161 N.J. 515, 575 (1999). Even remarks not based on trial evidence may not require reversal if they have "no direct bearing on the determination of [the] defendant's guilt." Feaster, 156 N.J. at 61.

With these guiding principles in mind, we turn to the challenged comments. At the outset, we note that during the prosecutor's summation and in response to defendant's objections, the trial court instructed the jury, as it did at the beginning of the case, that what the attorneys stated to them is not evidence. In one instance, the trial court specifically instructed as follows:

> So I told you in the beginning, I'll tell you again, this instruction that what they say during their opening statement and closing arguments is what? Not evidence. Right? It's your recollection of the evidence that controls. You're the ones who are listening because you're the judges of the facts, nobody else. Let's get that straight, right?

The court repeated a similar instruction during its final charge in accordance with the model jury charges. See Model Jury Charges (Criminal), "Criminal Final Charge" (rev. May 12, 2014).

We conclude that the prosecutor's challenged statements were either supported by the evidence, see Frost, 158 N.J. at 82, or if improper, were not so egregious as to substantially prejudice defendant, Johnson, 31 N.J. at 510.

43

While the statements were made to challenge defendant's credibility, they did not directly bear on the determination of defendant's guilt and his role in K.D.'s death. See Feaster, 156 N.J. at 61. Moreover, to the extent any of the comments were objectionable, the trial court's repeated instruction to the jury that its recollection of the facts controlled, as requested by defense counsel when he objected to the prosecutor's remarks, cured any harm. See Verdicchio v. Ricca, 179 N.J. 1, 36 (2004) (finding a new trial was not warranted where a prosecutor made three improper statements during summation but the court "immediately identified" them as such and instructed the jury not to consider the statements during deliberations); see also Frost, 158 N.J. at 86-87.

Here, again, we have no cause to believe that the jury did not follow the trial court's instructions. See State v. Montgomery, 427 N.J. Super. 403, 410 (App. Div. 2012) ("Jurors are presumed to have followed the court's instructions in the absence of evidence demonstrating otherwise.").

Cumulative Errors

We find defendant's remaining argument that he did not receive a fair trial because of the court's cumulative errors to be without any basis as we have determined that no errors were committed, other than the failure to address his speedy trial claims, which will be addressed by the trial court on remand.

Affirmed in part; remanded in part for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0967-17T4